1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ZANE FLOYD,                                    )
                                               )
         Petitioner,                           )         2:06-cv-0471-PMP-CWH
                                               )
vs.                                            )
                                               )         **ORDER**
RENEE BAKER, *et al.*,                         )
                                               )
         Respondents.                          )
                                               )
_____/

16   Introduction

17        This action is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by

18   Zane Floyd, a Nevada prisoner sentenced to death.  The case is before the court for resolution

19   of the merits of the claims remaining in Floyd's second amended petition for a writ of habeas

20   corpus, and with respect to a motion for evidentiary hearing.  The court denies the second amended

21   petition.  The court finds that an evidentiary hearing is not warranted, and denies the motion for

22   evidentiary hearing.  The court grants Floyd a certificate of appealability with respect to three of his

23   claims.

24   Background Facts and Procedural History

25        In its March 13, 2002, decision on Floyd's direct appeal, the Nevada Supreme Court

26   described, as follows, the factual background of the case, as revealed by the evidence at trial:

Early in the morning on June 3, 1999, Floyd telephoned an "outcall" service and asked that a young woman be dispatched to his apartment. As a result, a twenty-year-old woman came to Floyd's apartment around 3:30 a.m. As soon as she arrived, Floyd threatened her with a shotgun and forced her to engage in vaginal intercourse, anal intercourse, digital penetration, and fellatio. At one point he ejected a live shell from the gun, showed it to the woman, and said that her name was on it. Eventually Floyd put on Marine Corps camouflage clothing and said that he was going to go out and kill the first people that he saw. He told the woman that he had left his smaller gun in a friend's vehicle or he could have shot her. Eventually he told her he had 60 seconds to run or be killed. The woman ran from the apartment, and around 5:00 a.m. Floyd took his shotgun and began to walk to an Albertson's supermarket which was about fifteen minutes by foot from his apartment.

Floyd arrived at the supermarket at about 5:15 a.m. The store's security videotape showed that immediately after entering the store, he shot Thomas Michael Darnell in the back, killing him. After that, he shot and killed two more people, Carlos Chuck Leos and Dennis Troy Sargeant. Floyd then encountered Zachary T. Emenegger, who attempted to flee. Floyd chased him and shot him twice. Floyd then leaned over him and said, "Yeah, you're dead," but Emenegger survived. Floyd then went to the rear of the store where he shot Lucille Alice Tarantino in the head and killed her.

As Floyd walked out the front of the store, Las Vegas Metropolitan Police Department (LVMPD) officers were waiting for him. He went back in the store for a few seconds and then came out again, pointing the shotgun at his own head. After a police officer spoke with him for several minutes, Floyd put the gun down, was taken into custody, and admitted to officers that he had shot the people in the store.

The jury found Floyd guilty of four counts of first-degree murder with use of a deadly weapon, one count of attempted murder with use of a deadly weapon, one count of burglary while in possession of a firearm, one count of first-degree kidnapping with use of a deadly weapon, and four counts of sexual assault with use of a deadly weapon.

The jury found the same three aggravating circumstances in regard to each of the murders: the murder was committed by a person who knowingly created a great risk of death to more than one person by means which would normally be hazardous to the lives of more than one person; the murder was committed at random and without apparent motive; and the defendant had, in the immediate proceeding, been convicted of more than one murder. For each murder, the jury imposed a death sentence, finding that the aggravating circumstances outweighed any mitigating circumstances. For the other seven offenses, the district court imposed the maximum terms in prison, to be served consecutively. The court also ordered restitution totaling more than $180,000.00.

*Floyd v. State,* 118 Nev. 156, 161-63, 42 P.3d 249, 253-54 (2002), *cert. denied*, 537 U.S. 1196

(2003), *overruled in part by Grey v. State*, 124 Nev. 110, 178 P.3d 154 (2008) (copies of the opinion

are in the record at Petitioner's Exhibit 6, and Respondents' Exhibit 7).[1]  Floyd pursued a direct appeal to the Nevada Supreme Court, and that court affirmed Floyd's conviction and sentence on March 13, 2002.  *Id*.

On June 19, 2003, Floyd filed a petition for writ of habeas corpus in the state district court, and he filed a supplement to that petition on October 6, 2004.  Respondents' Exhibits 9, 11.  That petition was denied in an order filed on February 4, 2005.  Petitioner's Exhibit 9; Respondents' Exhibit 13.  On appeal, on February 16, 2006, the Nevada Supreme Court affirmed the denial of the habeas petition.  Petitioner's Exhibit 12; Respondents' Exhibit 18.

On April 16, 2006, this court received from Floyd a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, initiating this federal habeas corpus action (ECF No. 1).  The court appointed the Federal Public Defender to represent Floyd, and counsel appeared on his behalf on May 22, 2006 (ECF Nos. 6, 8).  Counsel filed a first amended habeas petition on Floyd's behalf on October 23, 2006 (ECF No. 18).

On January 25, 2007, respondents filed a motion to dismiss (ECF No. 27), contending that several claims in Floyd's first amended habeas petition were not exhausted in state court, and contending that certain of Floyd's claims were not cognizable in a federal habeas proceeding. While the motion to dismiss was pending, on March 29, 2007, Floyd filed a motion for leave to conduct discovery (ECF No. 35).  On April 25, 2007, on account of the unexhausted claims in Floyd's first amended petition, the court stayed the action pending exhaustion of Floyd's claims in state court.  *See* Order entered April 25, 2007 (ECF No. 47).  The court denied the motion to dismiss without prejudice, and denied the motion for leave to conduct discovery as moot.  *Id*.

On June 8, 2007, Floyd filed a second state habeas petition in state district court.  Petitioner's Exhibit 396; Respondents' Exhibit 20.  On February 22, 2008, the state district court held an

---

[1]  The exhibits referred to in this order as "Petitioner's Exhibits" were filed by Floyd and are found in the electronic record for the case at ECF Nos. 1, 2, 3, 67, 68, 69, 70, 71, and 72.  The exhibits referred to in this order as "Respondents' Exhibits" were filed by respondents and are found in the electronic record at ECF Nos. 28, 29, 78, 111, 112, 113, 125, and 126.

1   evidentiary hearing on one narrow issue:  whether post-conviction counsel in Floyd's prior state

2   proceeding was ineffective in failing to pursue relief based on Floyd's alleged organic brain damage.

3   Respondents' Exhibit 25 (transcript).  On April 2, 2009, the state district court entered an order

4   denying relief.  Respondents' Exhibit 26.  Floyd appealed, and on November 17, 2010, the Nevada

5   Supreme Court affirmed the lower court's ruling.  Petitioner's Exhibit 386; Respondents' Exhibit 31.

6          On March 16, 2011, Floyd filed a motion (ECF No. 59) reporting that the further state-court

7   proceedings had been completed, and requesting that the stay of this case be lifted.  That motion was

8   granted, and the stay of this action was lifted on March 22, 2011.  *See* Order entered March 22, 2011

9   (ECF No. 61).

10         On June 13, 2011, Floyd filed a second amended petition for writ of habeas corpus (ECF No.

11   66), which is now the operative petition in this federal habeas corpus action.

12         Respondents filed a motion to dismiss Floyd's second amended petition, contending that

13   several claims in that petition are barred by the doctrine of procedural default (ECF No. 77).

14         While the parties were briefing the motion to dismiss, Floyd filed a motion for leave of court

15   to amend his second amended petition, to add a Claim 17 to the petition (ECF No. 91).  The

16   respondents did not oppose that motion (*see* ECF No. 93).  The court granted the motion (ECF No.

17   94), and allowed Floyd to file a supplement to his second amended petition, adding Claim 17.  Floyd

18   filed that supplement, adding Claim 17, on January 30, 2012 (ECF No. 95).[2]

19         On August 20, 2012 (ECF No. 114), the court granted in part, and denied in part,

20   respondents' motion to dismiss.  The court order dismissed Claims 1A, 1B, 1C, 1D (in part), 1E, 1F,

21   1G, 2, 3, 4 (in part), 6, 8, 11, 12, 14, 15, and 17 (in part).  *See* Order entered August 20, 2012 (ECF

22   No. 114).  In all other respects, the court denied the motion to dismiss.  Floyd filed a motion for

23

24

25

26
        _____

        [2] In this order, the court refers to Floyd's entire petition, as filed on June 13, 2011, and as further
     amended to add Claim 17 on January 30, 2012, as Floyd's "second amended petition."

1    reconsideration of the August 20, 2012 order (ECF No. 116), and the court denied that motion on

2    February 22, 2013 (ECF No. 119).[3]

3          On June 19, 2013, respondents filed an answer (ECF No. 127), responding to the remaining

4    claims in Floyd's second amended petition.  On January 6, 2014, Floyd filed a reply (ECF No. 134).

5    Respondents filed a response to Floyd's reply on March 6, 2014 (ECF No. 138).

6          Along with his reply, on January 6, 2014, Floyd filed a motion for evidentiary hearing (ECF

7    No. 135).  Respondents filed an opposition to that motion on March 17, 2014 (ECF No. 140).  Floyd

8    filed a reply on April 11, 2014 (ECF No. 144).

9    Standard of Review of the Merits of Floyd's Remaining Claims

10         Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254

11   enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Lindh v.*

12   *Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000),

13   overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).  28 U.S.C. § 2254(d) sets

14   forth the primary standard of review under AEDPA:

15              An application for a writ of habeas corpus on behalf of a person in custody
             pursuant to the judgment of a State court shall not be granted with respect to any
16           claim that was adjudicated on the merits in State court proceedings unless the
             adjudication of the claim --

17
                (1)  resulted in a decision that was contrary to, or involved an unreasonable
18           application of, clearly established Federal law, as determined by the Supreme Court
             of the United States; or

19

20

21

22   _____

23         [3]  In their briefing of the merits of Floyd's remaining claims, Floyd and the respondents argue
     that the court should reconsider certain aspects of the August 20, 2012 order.  *See, e.g.*, Answer (ECF
     No. 127), pp. 47-48; Reply (ECF No. 134), pp. 2-5; Response to Reply (ECF No. 138), pp. 23-25.  Floyd
24   also seeks reconsideration of the August 20, 2012 order in his motion for evidentiary hearing.  *See*
     Motion for Evidentiary Hearing (ECF No. 135); Reply in Support of Motion for Evidentiary Hearing
25   (ECF No. 144).  Floyd has previously litigated a motion for reconsideration of the August 20, 2012
     order, and the court denied that motion.  *See* Order entered February 22, 2013 (ECF No. 119).
26   Respondents could have, but did not in a timely manner, seek reconsideration of the August 20, 2012
     order.  The court has considered the arguments now asserted by the parties in this regard, and determines
     that there is no compelling reason for the court, at this point, to reconsider the August 20, 2012 order.

1

     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

2

3 28 U.S.C. § 2254(d).

4    A state court decision is contrary to clearly established Supreme Court precedent, within the

5 meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set

6 forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially

7 indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result

8 different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)

9 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685,

10 694 (2002)).

11    A state court decision is an unreasonable application of clearly established Supreme Court

12 precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct

13 governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

14 principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S.

15 at 413). The "unreasonable application" clause requires the state court decision to be more than

16 incorrect or erroneous; the state court's application of clearly established law must be objectively

17 unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

18    The Supreme Court has further instructed that "[a] state court's determination that a claim

19 lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

20 correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786

21 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated

22 "that even a strong case for relief does not mean the state court's contrary conclusion was

23 unreasonable." *Id*. (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131

24 S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

25 deferential standard for evaluating state-court rulings, which demands that state-court decisions be

26 given the benefit of the doubt" (internal quotation marks and citations omitted)).

1      The state court's "last reasoned decision" is the ruling subject to section 2254(d) review.

2   *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).  If the last reasoned state-court decision

3   adopts or substantially incorporates the reasoning from a previous state-court decision, a federal

4   habeas court may consider both decisions to ascertain the state court's reasoning.  *See Edwards v.*

5   *Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

6      If the state supreme court denies a claim but provides no explanation for its ruling, the

7   federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the

8   petitioner is entitled to federal habeas corpus relief only if "there was no reasonable basis for the

9   state court to deny relief."  *Harrington*, 131 S.Ct.  at 784.

10      The analysis under section 2254(d) looks to the law that was clearly established by United

11   States Supreme Court precedent at the time of the state court's decision.  *Wiggins v.  Smith*, 539 U.S.

12   510, 520 (2003).

13   Analysis

14      Claims 1D(1) and 10, and the Related Part of Claim 17A

15      In Claim 10, Floyd claims that his constitutional rights were violated by improper closing

16   arguments of the prosecutors in both the guilt and penalty phases of his trial (Claim 10A), that his

17   trial counsel was ineffective for failing to object to the provision of transcripts of the prosecutors'

18   closing arguments to the jurors to review during their deliberations (Claim 10B), and that the State

19   wrongfully failed to preserve blood sample taken from him for drug and alcohol testing (Claim

20   10B).  Second Amended Petition (ECF No. 66), pp. 195-204.[4]  In Claim 1D(1), Floyd claims that his

21

22      [4] Floyd asserts certain claims for the first time in the portion of his reply concerning Claim 10:
regarding comments in the State's opening statement in the guilt phase of the trial (Reply (ECF No.

23   134), pp. 43, 45); regarding a comment by a prosecutor that the jury should make certain that the next
day's newspaper headlines read "death penalty" (Reply, p. 43); regarding a prosecutor's argument that

24   "I trust that you will agree with Mr. Bell and myself that for his crimes he deserves what is in this case
a just penalty of death" (Reply, p. 45); regarding a prosecutor's characterization of mitigating evidence

25   as "excuses" (Reply, pp. 43-44); and regarding a prosecutor saying "give me a break" in response to the
defense position that Floyd's cooperation with the police was a mitigation circumstance (Reply, pp. 43-

26   44).  Floyd did not include these claims in his second amended petition.  *See* Second Amended Petition,
pp. 195-204.  They are improperly raised for the first time in the reply, and the court does not consider
them.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).

trial counsel were ineffective for failing to object to the alleged improper closing arguments made by

the prosecutors.[5]  *Id.* at 78.  In Claim 17A, Floyd claims that his appellate counsel was ineffective

for failing to raise on his direct appeal his claims regarding alleged prosecutorial misconduct.

Amendment to Second Amended Petition (ECF No. 95), p. 264.

On Floyd's direct appeal, the Nevada Supreme Court addressed the prosecutors' alleged

improper arguments, and ruled as follows:

> Floyd asserts that several comments by the prosecution constituted misconduct.  A prosecutor's comments should be considered in context, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."  [Footnote:  *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).]  Moreover, Floyd failed to object to some of the remarks.  [Footnote:  *Riley v. State*, 107 Nev. 205, 218, 808 P.2d 551, 559 (1991) (stating that generally this court will not consider whether a prosecutor's remarks were improper unless the defendant objected to them at the time, allowing the district court to rule upon the objection, admonish the prosecutor, and instruct the jury); *c.f.* NRS 178.602 (providing that despite lack of objection, this court may address an error if it was plain and affected a defendant's substantial rights).]  Most of the comments require no discussion because they all either were proper or did not amount to prejudicial error.

> However, we will discuss one comment which was inappropriate.  During closing argument in the guilt phase, the prosecutor told the jury that Floyd "perpetrated the worst massacre in the history of Las Vegas."  The jury began its deliberations soon after.  Defense counsel then objected to the prosecutor's remark as prejudicial and inflammatory.  The district court responded:  "I think [the remark] isn't within the evidence.  I also don't think it is true.  What remedy would you suggest, now that the jury is gone?  If you wish, I'll bring them back in and say that that wasn't proper argument."  Defense counsel declined that proposal because he thought "an admonition would be moot and would raise more attention than the original comment."

> The district court was correct that the record contains nothing to support the prosecutor's remark, and it is elementary that "a prosecutor may not make statements unsupported by evidence produced at trial."  [Footnote:  *Guy v. State*, 108 Nev. 770, 780, 839 P.2d 578, 585 (1992); *see also Leonard v. State*, 114 Nev. 1196, 1212, 969 P.2d 288, 298 (1998); *Collier v. State*, 101 Nev. 473, 478, 705 P.2d 1126, 1129 (1985).]  The remark was therefore improper.  [Footnote:  The State contends that the comment was "simply an accurate statement of fact known to anyone who has lived

---

[5]  This portion of Claim 1D, designated Claim 1D(1), is set forth in paragraph 175 of Floyd's second amended habeas petition.  In Claim 1D(1), Floyd incorporates all the allegations of prosecutorial misconduct that he makes in Claim 10.  However, the portion of Claim 1D(1) based on counsel's failure to object to the prosecution's failure to preserve the blood sample (*see* Second Amended Petition, p. 203 (Claim 10C)) has been dismissed as procedurally defaulted.  *See* Order entered August 20, 2012 (ECF No. 114), p. 10.

1    in Las Vegas any length of time, and akin to arguing in the Timothy McVeigh case
     that the Oklahoma bombing was the worst massacre in the history of the State of
2    Oklahoma."  This extravagant comparison is neither apt nor persuasive.  The multiple
     murders in this case were an exceptional occurrence, but even a quick look at this
3    court's case law shows that unfortunately they do not stand alone in Las Vegas
     history.  In 1992, four people were shot to death in a Las Vegas apartment in the
4    presence of two young children.  *See Evans v. State*, 112 Nev. 1172, 926 P.2d 265
     (1996).]  We caution prosecutors to refrain from inflammatory rhetoric:  "Any
5    inclination to inject personal beliefs into arguments or to inflame the passions of the
     jury must be avoided.  Such comments clearly exceed the boundaries of proper
6    prosecutorial conduct."  [Footnote:  *Shannon v. State*, 105 Nev. 782, 789, 783 P.2d
     942, 946 (1989).]  Here, given the overwhelming evidence of Floyd's guilt, we
7    conclude that the error was harmless.  [Footnote:  *See* NRS 178.598 ("Any error,
     defect, irregularity or variance which does not affect substantial rights shall be
8    disregarded.").]

9    *Floyd*, 118 Nev. at 172-74, 42 P.3d at 260-61.

10        Floyd also made claims in his first state habeas action regarding alleged improper

11   prosecution argument, and, on the appeal in that action, the Nevada Supreme Court ruled as follows:

12        Floyd asserts that his trial counsel was ineffective in failing to object to
          several instances of alleged prosecutorial misconduct.  Although misconduct
13        occurred, it was not prejudicial in this case.

14        Floyd's counsel raised prosecutorial misconduct on direct appeal.  This court
          addressed one instance specifically; in regard to the others, we stated:  "Floyd asserts
15        that several comments by the prosecution constituted misconduct....  Floyd failed to
          object to some of the remarks.  Most of the comments require no discussion because
16        they all either were proper or did not amount to prejudicial error."  [Footnote:  *Floyd*,
          118 Nev. at 172-73, 42 P.3d at 260 (footnote omitted).]  Given this ruling, Floyd's
17        reliance in part on misconduct alleged on direct appeal fails to establish any
          prejudice.
18
          But Floyd newly raises three instances of misconduct that his counsel failed to
19        object to.  All occurred during closing argument in the penalty phase as the
          prosecution rejected the mitigating circumstances proffered by Floyd.
20
          So the defense has made a laundry list of <u>red herrings</u> to make it appear in this
21        case that there is a whole lot of them and, therefore, they should have some
          weight.  They've stacked wishes upon hopes upon dreams that you'll count
22        numbers, that you'll count some things twice, and you'll say "Well, wait a
          minute.  There's a lot of mitigation here."
23
                              *    *    *
24
          Now, it really doesn't matter that Mr. Bell [defense counsel] took this entire
25        box of paper clips and threw it on the table.  You could have every one of
          these.  How on earth could all of these reasons or <u>excuses</u>, whatever you want
26        to call them, how could all of them put together possibly outweigh the fact

                                        9

that more than one person was killed in this case?  How could that possibly outweigh a second murder?  It can't.  None of these combined.

\*   \*   \*

Cooperation with the police as a mitigating circumstance?  <u>Give me a break.</u>  How does that reduce his moral culpability?

\*   \*   \*

<u>You can throw the whole list away</u>.

We have underlined the rhetoric that is misleading or excessively intemperate and derogatory toward the defense.  First, as discussed above, mischaracterizing mitigating evidence as "excuses" could seriously mislead jurors.  Second, rhetoric such as "Give me a break" and "red herrings" unfairly imply that the defense is trying something underhanded.  This court has repeatedly warned prosecutors not to "disparage legitimate defense tactics" in this manner.  [Footnote: *See, e.g.*, *Pickworth v. State*, 95 Nev. 547, 550, 598 P.2d 626, 627 (1979); *Barron v. State*, 105 Nev. 767, 780, 783 P.2d 444, 452 (1989).]  We considered it "highly improper" for a prosecutor to tell jurors that a defendant's drug intoxication defense was a "red herring" aimed at gaining a compromise verdict of second-degree murder.  [Footnote: *Pickworth*, 95 Nev. at 550, 598 P.2d at 627.]  As we have explained, prosecutors have a "duty not to ridicule or belittle the defendant or his case.  The appropriate way to comment, by the defense or the State, is simply to state that the prosecution's case or the defendant is not credible and then to show how the evidence supports that conclusion."  [Footnote: *Barron*, 105 Nev. at 780, 783 P.2d at 452 (citation omitted).]

A defendant and his counsel have the right to introduce evidence and argue the existence of mitigating circumstances in a capital penalty phase.  That is all Floyd and his counsel did here, and on direct appeal this court stated:  "This mitigating evidence is not insignificant, but given the aggravating circumstances and the multiple, brutal, unprovoked murders in this case, we do not deem the death sentences excessive."  [Footnote: *Floyd*, 118 Nev. at 177, 42 P.3d at 263.]  For their part, prosecutors are entitled to argue that the evidence presented by the defendant fails to establish any mitigating circumstances or that any mitigating circumstances lack weight in comparison to the aggravating circumstances.  However, they violate their primary duty, which is to see that justice is done, when they suggest to the jury that the defendant's case for a sentence less than death is somehow outrageous or illegitimate.  [Footnote: *See Williams v. State*, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987).]

We assume that counsel had no sound strategy for not objecting to these remarks.  Nevertheless, we conclude that there is no reasonable probability that Floyd would not have received a death sentence if his counsel had objected at trial or raised this issue on appeal.

Order of Affirmance, Petitioner's Exhibit 12, pp. 9-12.

It is clearly established federal law within the meaning of § 2254(d)(1) that a prosecutor's improper remarks violate the Constitution if they so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Parker v. Matthews*, __ U.S. __, 132 S.Ct. 2148, 2153, (2012) (per curiam); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Comer v. Schriro*, 480 F.3d 960, 988 (9th Cir.2007). The ultimate question is whether the alleged misconduct rendered the petitioner's trial fundamentally unfair. *Darden,* 477 U.S. at 183. In determining whether a prosecutor's argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. In considering the effect of improper prosecutorial argument, the court may consider whether the argument manipulated or misstated the evidence; whether it implicated other specific rights of the accused, such as the right to counsel or the right to remain silent; whether the court instructed the jury that its decision is to be based solely upon the evidence; whether the court instructed that counsel's remarks are not evidence; whether the defense objected; whether the comments were "invited" by the defense; and whether there was overwhelming evidence of guilt. *See Darden*, 477 U.S. at 181-82. The standard is general, leaving courts leeway in case-by-case determinations. *Parker*, 132 S.Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In a federal habeas corpus action, to grant habeas relief, the court must conclude that the state court's rejection of the prosecutorial misconduct claim was objectively unreasonable, that is, that it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 132 S.Ct. at 2155 (quoting *Harrington*, 131 S.Ct. at 767-87).

Applying these standards, the court finds that the rulings by the Nevada Supreme Court denying relief on the claims asserted by Floyd in Claims 1D(1) and 10, and the related portion of Claim 17A, were not objectively unreasonable. While some of the prosecutors' comments in the State's closing arguments in the guilt phase of the trial were improper, given the weight of the

1   evidence against Floyd and the nature of those comments, the court concludes that those comments

2   had no effect on the fairness of Floyd's trial.

3     Regarding the prosecution's guilt-phase closing arguments, Floyd highlights, as "[p]erhaps

4   the most egregious comment," the following:

5     The bottom line, ladies and gentlemen, is that Zane Floyd purposely, intentionally,
  premeditatedly, deliberately perpetrated the worst massacre in the history of
6     Las Vegas.

7   Exhibit 43, p. 50; *see* Second Amended Petition, p. 198.  The Nevada Supreme Court discussed this

8   comment in its opinion on Floyd's direct appeal, and found the comment to be improper, but

9   concluded, reasonably in this court's view, that the error was harmless.  *Floyd*, 118 Nev. at 172-74,

10  42 P.3d at 260-61; *see also id.*, 118 Nev. at 177, 42 P.3d at 263 (Maupin, C.J., and Agosti, J.,

11  concurring) ("I concur in the result reached by the majority, but write separately to state my view

12  that there was no prosecutorial misconduct at trial in connection with the "massacre" argument....

13  While the rhetoric was not specifically accurate, the argument was a legitimate comment on the

14  apparent random gunning down of five people, killing four of them.").  The comment did not go to

15  any factual dispute in the case.  While the comment was improperly inflammatory, this court finds

16  that it had no impact on the outcome of Floyd's trial.  The magnitude and brutality of Floyd's

17  shooting rampage was plain from the evidence; the prosecutor's characterization of it added little.

18  Moreover, the trial court properly instructed the jury that the evidence they were to consider

19  consisted of the testimony of witnesses, exhibits, and any facts admitted or agreed to by counsel, and

20  that "[s]tatements, arguments and opinions of counsel are not evidence in the case."  Exhibit 44,

21  Instruction No. 6.

22    Floyd also claims that certain remarks made by the prosecutors in their closing arguments in

23  the guilt phase of the trial were improper expressions of personal opinion and referred to facts not in

24  evidence, Floyd points to the following remarks of the prosecutors in this regard:

25    (1)  "... I don't think there's much question about the facts in this case."
      (Respondents' Exhibit 43, p. 10);

26

(2)     "There can be no doubt, of course, that she [the sexual assault victim] was in the presence of the defendant." (*Id.* at 12);

(3)     "I hope that you will understand her [the sexual assault victim's] reluctance to get involved.  I hope that you will understand the system that had her arrested in order to secure her testimony.  We felt that the case was sufficiently important that we needed not just her as a victim for the counts charged, but also to have an accurate accounting of that one and a half or two hours that he intentionally omitted." (*Id.* at 13) (objected to, and objection sustained);

(4)     "It is difficult to understand, based on everything we've heard, how a man could forget an hour and a half activity with [the sexual assault victim], particularly when it preceded maybe by ten minutes, the homicides.  Zane Floyd recalled walking from his house.  He recalled putting on his boots.  He recalled turning on the music.  He recalled walking every step.  Those were his words, every step through the store, even the direction he took.  Yet for whatever reason, and I'm sure it has something to do with his idea of what a man is and what, how others are to view a man, killing is one thing, but raping or sexually assaulting a woman, that is a cowardly act, and so you don't want to mention that." (*Id.* at 14);

(5)     "If you find not guilty as to Mr. Emenegger [the victim of the attempted murder], which seems rather rash, then I presume your logic would follow that you would find not guilty as to everybody else." (*Id.* at 22);

(6)     "The fact that no condom was used in this case is probably proof enough.  A lady such as her has to use condoms, if they don't want to die an early death of AIDS or some other sexually transmitted disease.  She had one, but she had no opportunity to get it out." (*Id.* at 25);

(7)     "Devil whiskey made me do it.  It wasn't me, it was methamphetamine or cocaine or heroin or PCP.  This is what defendants would say for years when they had no real excuse for the conduct that they committed." (*Id.* at 39) (objected to, and objection sustained);

(8)     "I think it is easy to look at what he did and what he said and make it absolutely clear that he knew exactly what he was doing when he raped [the sexual assault victim] and he knew exactly what he was doing and the consequences thereof when he shot everybody he could find in the Albertson's store at about 5:15 ...." (*Id.* at 43);

(9)     "He told [the sexual assault victim] if he had a smaller gun he could kill her and he told her he had a smaller gun, but he left it in a friend's car.  Didn't that turn out to be true?  He told the police he had a smaller gun.  He left it in Mr. Godman's car.  We had the gun salesman who came on and said I sold him a pistol at the same time I sold him a rifle.  And what's the materiality?  He understood fully well that if he shot her with that shotgun it would make so much noise that people would hear, the police would be called, he would only be able

13

1     to kill one person.  But if he had a smaller gun, he could have killed
her with the smaller gun and then still maybe gone down to
2     Albertson's and gone on a shooting spree with the shotgun.  If he had
that pistol, [the sexual assault victim] wouldn't be alive today."  (*Id*. at
3     45); and

4     (10)   "I mean if he was going to kill himself, then there was no
accountability....  But then when it came down to it, he didn't have the
5     courage to pull the trigger.  And so there has to be some
accountability."  (*Id*. at 51-52).

6

7   *See* Second Amended Petition, pp. 195-98.  Regarding the second, sixth, and ninth remarks quoted

8  above, the court finds them to be appropriate commentary on the evidence, without any expression

9  of improper personal opinion.  In the other seven, the prosecutor did speak in the first person, and

10  did perhaps express personal opinion.  However, with respect to the first, fourth, fifth, eighth, and

11  tenth remarks quoted above, those remarks concerned inferences or conclusions that could arguably

12  be drawn from the evidence; while it is improper for prosecutors to make arguments in terms of their

13  personal beliefs, those remarks were essentially fair commentary on the evidence.  The other two

14  remarks -- the third and seventh quoted above -- were improper expressions of opinion regarding

15  matters not in evidence.  Defense counsel objected to those remarks, and the court sustained the

16  objections, undermining their force.  And, at any rate, none of the prosecutor's improper expressions

17  of personal opinion were anywhere near egregious enough to render Floyd's trial unfair.

18         Floyd also claims that, in their closing arguments in the guilt phase of the trial, the

19  prosecutors made remarks that misstated the law; in this regard, Floyd points to the following:

20     (1)   "I'm going to get into, what I would ask you to do, you can approach
deliberations any way you want, but we have so many different crimes.  What
21     you might wish to do is take it one crime at a time, and the verdict forms will
probably be in that order:  Burglary, murder, kidnapping, sexual assault."
22     (Respondents' Exhibit 43, p. 14);

23     (2)   "The burglary, the wording is a little different, but it also has the weapons
enhancement.  Now what is a burglary.  The judge read the instructions.
24     Some people confuse burglary with robbery.  We have burglary in this case.
Burglary occurs when someone crosses the threshold of your residence, a
25     business, your automobile, puts their hand in your automobile, open window,
let's say, with the intention of committing any felony, stealing your purse out
26     of it.  If it has more than 250 bucks in it, that's a felony, or with the intention
of stealing.  Reaching inside your car, if you can believe it, and there's a

1   nickel in there and somebody picks that nickel up off the seat of the car, that
    technically is a felony in the State of Nevada, felony burglary.  We're not

2   there, obviously, and I don't want to trivialize the offense of burglary, but I'm
    simply illustrating to you what the crime is.  It doesn't matter, as in this case,

3   that the store is open for business.  That doesn't matter.  You walk into Save-
    On Drug and with the intention – and that's the key, what was your intention

4   when you crossed that threshold – with the intention of stealing, you have
    committed the crime, whether you steal or not.  Now, nobody can ever prove

5   that crime, of course against you, but that is the crime of burglary.  That's
    how it is defined in the State of Nevada.  We live in Nevada, so we'll follow

6   the law of the State of Nevada.  Many people come from other state where it's
    not quite the same way.  If you have sat in juries elsewhere you might be

7   surprised by what the law is in this state."  (*Id*. at 16-17);

8   (3)   "Next I would like to discuss with you first degree murder, because that is
    what we have charged him with.  After burglary we have four counts of first

9   degree murder.  First degree murder can be committed two ways, so that's
    why I brought this out and it is really quite simple.  Let's just say first degree

10  murder.  The first way is premeditated and deliberate murder, premeditated
    deliberate intentional murder.  Premeditated.  I think that's right.  Deliberate.

11  And the other element is willful.  I want to make sure I spell that right.  That's
    the first way, and I would submit to you that we don't even have to talk about

12  the second one, but I'm going to talk about it anyway because it applies to this
    case because the law in the State of Nevada allows two different theories of

13  first degree murder.  And when you read the instructions you will conclude
    that only lawyers could draft these things because they sound so much alike

14  that there's hardly a distinction."  (*Id*. at 17-18); and

15  (4)   "Sexual assault is simply sex with another person against that person's will.
    That's it.  That's it.  You don't have to beat them, you don't have to threaten

16  them with a gun, you don't have to hurt them.  It is simply sex that is against
    th will of the victim, or, or where the defendant should know that the victim is

17  incapable of resisting.  They are both applicable in this case.  You can take
    your choice.  You don't need both, you can take your choice.  A 115 pound

18  lady versus a 200 pound man with a shotgun on his home turf, no one can
    resist that ver successfully."  (*Id*. at 24-25) (objected to; trial judge stated:

19  "I'm not sure that I agree with your example ... but the instruction will speak
    for itself.").

20

21  *See* Second Amended Petition, pp. 196-97.  As to none of these remarks has Floyd shown the

22  prosecutor to have clearly misstated the law; where the remarks arguably include inaccurate

23  statements of law, they are at best muddled and ambiguous.  The law was properly and clearly set

24  forth in jury instructions, and the jury was instructed to follow the law as stated in those instructions.

25  *See* Exhibit 44, Instructions No. 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 25, 26, and 28.  Floyd has

26

15

1  not shown how any arguable misstatement of law in these remarks could have affected his trial such

2  as to render it unfair.

3       Floyd also contends that the prosecution improperly "attempted to shift the burden of proof"

4  in making the following remarks in the State's closing argument in the guilt phase of his trial:

5       Murder of the second degree is a lesser included offense of murder of the first degree.
        You are allowed to consider murder of the second degree only, only if you have a
6       reasonable doubt as to murder of the first degree.  It is not one of these things where
        you have a choice, you know, you flip a coin and say hey, let's give him murder of
7       the second degree.  No, no, only if Mr. Bell [the other prosecutor] and I have not
        proven to you beyond a reasonable doubt that he committed murder of the first
8       degree.   Only then do you even look at murder of the second degree....

9  Respondents' Exhibit 43, p. 23; *see* Second Amended Petition, p. 197.  Floyd does not explain how

10  this argument might have shifted the burden of proof, or how it was improper in any other respect,

11  such as to render his trial unfair.  *See* Exhibit 44, Instruction No. 19 ("You may consider the lesser

12  offense of murder of the second degree only if you have a reasonable doubt as to the offense of

13  murder of the first degree.").

14       Finally, with respect to the prosecutors' closing arguments in the guilt phase of his trial,

15  Floyd claims that, in the following comment, the prosecutor "improperly misstated the law, appealed

16  to the community conscience, and then attempted to shift the burden of proof":

17       When we started this case last Monday there was a presumption of innocence
        and he was clothed with that presumption of innocence at that time.  Once Mr. Bell
18       [the other prosecutor] and I present you with sufficient evidence to prove to you his
        guilt beyond a reasonable doubt, that presumption was removed and you as jurors in
19       our system, the only way to let the judge and the community know that the
        presumption of innocence is no longer there is to return verdicts of guilty.
20

21  Respondents' Exhibit 43, p. 29;  *see* Second Amended Petition, pp. 197-98.  Floyd argues that the

22  prosecutor's argument was incorrect and improper because "[t]he presumption of innocence persists

23  until the jury deliberates and determines that guilt has been demonstrated beyond a reasonable

24  doubt."  *Id*. at 198.  The court finds that there was no misstatement of the law in this comment;

25  certainly, there was no misstatement of law that could possibly have rendered Floyd's trial unfair.

26  The prosecutor's point was essentially correct -- only proof of guilt beyond a reasonable doubt could

overcome the presumption of innocence. *See* Exhibit 44, Instruction No. 5 ("The Defendant is presumed innocent unless the contrary is proved.").  Moreover, the prosecutor did not minimize the importance of the presumption of innocence; on the contrary, the prosecutor went on from the contested comments to conclude his argument as follows:

> That is how it's done.  It is called due process in this country.  Whether you are a citizen or not, you are entitled to that due process and that's what we have been through in this courtroom.  As one gentleman said, we are not in Turkey, we are not in Iran, we are not wherever.
>
> We are here in America.  We have a due process clause that applies to everybody, no matter how heinous the crime.  And it is because of that due process clause that we have gone through this week presenting the evidence to you so that when you do return the guilty verdicts, which I fully expect, based on the evidence, you can at least assure the world that we have provided him with the due process that our constitution demands that he be given.  Thank you.

Respondents' Exhibit 43, pp. 29-30.

Turning to the penalty phase of the trial, Floyd claims that the prosecutors improperly expressed personal opinion, and misstated the facts in evidence, in the State's closing argument in the penalty phase of his trial, in the following remarks:

(1)  "And the third mitigator is that the killing was random and without apparent motive.  Nothing scares people more than the potential of random victimization.  Let me repeat that.  Nothing scares people more than the potential of random victimization."  (Respondents' Exhibit 51, p. 45) (objected to, and objection overruled);

(2)  "The victims were absolutely innocent.  They were doing what we expected people to do.  They were going to work, trying to feed their families, when they were brutally and senselessly killed.  The defendant had no bone to pick with the victims.  He had no bone to pick with Albertson's.  It wasn't like he was a fired employee and had some misguided thought that he wanted retribution.  It was a thrill kill to kill whoever was available."  (*Id.* at 46);

(3)  Four, how did the killings occur?  These killings are so vicious and done so ugly.  Tommy Darnell was shot in the back; no chance.  Troy Sargent shot in the heart; no chance.  Chuck Leos shot twice; both deadly wounds; no chance.  But even worse than that, Zachary Emenegger was hunted down and gunned down.  He was begging, "No, no, please," as he was shot, knocked to the ground and shot again.  The ruthlessness of this crime is beyond belief.  And, of course, the most ruthless of all is poor Luci Tarantino, a grandmother, a lady in her 60s who wouldn't hurt a fly.  She's begging for her life and this defendant calmly walks up within two feet of her face and pulls the trigger – full well knowing he had an expertise in guns and he told the police what was going to happen – that her head would just explode."  (*Id.* at 52-53);

17

(4)    "The defendant has a hollow soul, ladies and gentlemen. He doesn't care who he hurts, when he hurts, or how he hurts as long as he can satisfy his own basic desires. He plays by his own rules and he doesn't care who suffers or how much. Make no mistake about that. You are in the presence of the most dangerous man you will ever encounter in ... your lifetime." (*Id*. at 55) (objected to, and objection overruled);

(5)    "Whereas this defendant has a heart bent on destruction. A hollow soul. And he still has a hollow soul today. When he gave his allocution, when he got up here to say he was sorry, he said the right words, but you could tell none of them came from the heart. He didn't look at the jury. He didn't look at the victims. He didn't even look at his mother. He just kind of looked out. As he did on June the 3rd. Sort of a blank stare, a monotone, ladies and gentlemen. The Zane Floyd that sits here today is the same Zane Floyd that was raping and killing on June 3rd." (*Id*. at 60-61);

(6)    "... [T]his coward ... This man who committed these cowardly acts and set out to kill himself whimpered out in front of the store and, as Mr. Bell [the other prosecutor] said, he tried to get away." (*Id*. at 127-28) (objected to, and objection overruled);

(7)    "These mitigators pale, pale in comparison to what you could pile up. Remember that table they had up here with all those things piled up on top? Take the average burglar that's in the Nevada State Prison. It would be a pile twice that high. Why? Because you would look into the background and truly see some depravity and some neglect and disadvantage. This is embarrassing." (*Id*. at 129);

(8)    "They mentioned a 10 by 15 cell block. Give me a break. He wants to be on the yard, he wants to play ball, he wants to watch television, have three meals a day –" (*Id*. at 137) (objected to, and objection sustained); and

(9)    "Many people do not kill even one person or rape a single human being and still receive life without parole. When I speak about ... When I speak about proportionality of sentence, surely a quadruple murderer deserves a greater punishment than those who have murdered only once, than those who have murdered only twice, or three times, or those who have not murdered at all or raped at all." (*Id*. at 137-38) ) (objected to, and objection sustained).

*See* Second Amended Petition, pp. 199-201. This court finds that with respect to first, second, third, fourth, fifth, and sixth comment quoted above, those remarks by the prosecutors were fair commentary on the evidence, and on the alleged aggravating circumstances, without any improper expression of personal opinion. In the other three comments above, the seventh, eighth, and ninth quoted comments, the prosecutor did express what were apparently opinions regarding facts not in evidence. With respect to the eighth and ninth quoted remarks, defense counsel objected and the

1    court sustained the objections.  At any rate, given the strength of the prosecution's case in the

2    penalty phase of the trial, none of the prosecutor's expressions of personal opinion were so

3    egregious as to render Floyd's trial unfair.

4         Floyd claims that the following argument mischaracterized the defense's argument:

5              I also rather expect we'll hear the ridiculous phrase "structured setting."  The
             defense, I have no doubt, is going to come up and concede that he can't ever live in
6             free society given what he did, but he'd be okay in a structured setting; i.e. prison.
             That's hogwash, ladies and gentlemen.  School's a structured setting and he was
7             constantly fighting in school, fighting other students, disruptive.

8    Respondents' Exhibit 51, p. 58; *see* Second Amended Petition, pp. 199-200.  The court finds that

9    this argument was not improper.  It was fair argument regarding the evidence, and regarding the

10   weight of proffered mitigation.  To the extent that, arguably, the prosecutor should not have used the

11   terms "ridiculous phrase" or "hogwash" to express the State's disagreement with the position of the

12   defense, those remarks were not so egregious as to render Floyd's trial unfair.

13        Floyd claims that in the following remarks, in the State's closing arguments in the penalty

14   phase of his trial, the prosecutor improperly expressed his personal opinion, "mischaracterized the

15   mitigation evidence," and "misstated the facts":

16             Well, let's talk about the mitigating circumstances that might conceivably be
             argued by the defense that are provided by law.
17
               The defendant has no significant criminal history.  Well, you know, the State
18            would concede that's probably a mitigating circumstance.  Should it be considered?
             He has one DUI. I don't think that's significant.  I think if I were a juror, I'd put that
19            one on the scale of justice.

20             The defendant was under extreme mental or emotional disturbance.  Now,
             understand this:  It's not clear whether that has to be simultaneously with the brutal
21            killings at Albertson's or a more general proposition.  But we do know this:  The
             defendant was not insane; he was not mentally ill; he was above average intelligence;
22            he knew right from wrong; he acted lawfully when he felt like it and unlawfully when
             he felt like it; he played by his own rules and let others suffer the consequences.
23
               Whether or not you believe that he was under significant emotional distress,
24            it's up to you.  Keep in mind when you're looking at that, by his own admission, any
             problems he had were of his own making.  It was he who quit his job; it was he who
25            chose to gamble; it was he who was frustrated with his girlfriend.  But it may be that
             some people will think that should go on the scale.

26

And the last specifically provided is the youth of the defendant.  Now, the law doesn't define youth either.  Some people may think 23 is young.  Other people may think that this should be reserved for people that are 16, 17, or 18 who commit first-degree murder.  But in any event, if one or more of you think that he's young and maybe ought to get a little credit for that, put that one there too.

Now in addition to these three that are provided by the law, again, I told you that it was open ended.  Any other mitigating circumstance.  So the defense has made a laundry list of red herrings to make it appear in this case that there's a whole lot of them and, therefore, they should have some weight.  They've stacked wishes upon hopes upon dreams that you'll count numbers, that you'll count some things twice, and you'll say, "Well, wait a minute.  There's a lot of mitigation here."

Just give you an example.  We know that the defendant was not intoxicated to the degree to affect his ability to formulate and carry out a plan of destruction.  But there's no question he'd had a couple of drinks.  Somebody thinks alcohol is a mitigating factor.  Throw that on the scale.

\*    \*    \*

The State submits this isn't even close, ladies and gentlemen.  When you put that over her and you put it on the scales of justice, it's a hundred to nothing.  The aggravators far, far, far outweigh all of the mitigators this defendant could [ever] bring forth.

\*    \*    \*

You can throw the whole list away.

Respondents' Exhibit 51, pp. 47-51, 128; *see* Second Amended Petition, pp. 199-200.  On the appeal in Floyd's first state habeas action, the Nevada Supreme Court found the prosecutors' description of mitigating factors proffered by the defendant as "red herrings," and their argument that "you can throw the whole list away," to be "misleading or excessively intemperate and derogatory toward the defense."  Order of Affirmance, Petitioner's Exhibit 12, pp. 10-11.  The Nevada Supreme Court also found that such arguments unfairly implied "that the defense is trying something underhanded."  *Id*. The court pointed out that prosecutors have a "duty not to ridicule or belittle the defendant or his case," and that they "violate their primary duty, which is to see that justice is done, when they suggest to the jury that the defendant's case for a sentence less than death is somehow outrageous or illegitimate."  *Id*. at 11-12.  The Nevada Supreme Court "assume[d] that counsel had no sound strategy for not objecting to these remarks," but, nevertheless, "conclude[d] that there is no

reasonable probability that Floyd would not have received a death sentence if his counsel had

objected at trial or raised this issue on appeal." *Id*. at 12.  This court finds reasonable the Nevada

Supreme Court's ruling with respect to the prosecutor's use of the phrases "red herrings," and "you

can throw the whole list away."  Beyond that, regarding the argument quoted above, the court finds

that it was fair commentary on the evidence and on the mitigating factors submitted by the defense.

Floyd claims that the prosecutor improperly expressed personal opinion, and "challeng[ed]

the jurors to explain their decision not to give death to the victim's families," as follows:

> MR. BELL [prosecutor]:  .... If not this case, ladies and gentlemen, what case?
> If not this case, what case?  If the conduct in this case is not sufficiently offenseive or
> the loss not sufficiently devastating to merit the maximum penalty allowed by law,
> then come back and tell me, and while you're at it, tell Leanne Leos, Mona Nall –
>
> MR. BROWN [defense counsel]:  Objection, your Honor.
>
> THE COURT:  Sustained.
>
> MR. BELL:  That there is a case that merits the maximum punishment
> because you've agreed to that when you were selected as jurors.  But this is not the
> case.  When you get back to the jury room with eight or ten or eleven of you and are
> convinced in your heart of hearts this is the case for the death penalty and two or
> three of you seem to have some difficulty on behalf of the citizens of this community,
> look at them and say, "If not this case, what case?"

Respondents' Exhibit 51, pp. 40-41; *see* Second Amended Petition, p. 199.  This court finds that this

argument was improper and that the trial court correctly sustained defense counsel's objection.  The

court does not, however, find the argument to be so egregious as to infect Floyd's trial with

unfairness.  The strength of the aggravating factors in this case -- the facts that Floyd murdered four

people, and put many more at great risk of death, at random and with no apparent motive -- was

made plain by the evidence, and the prosecutors' commentary added little force to that evidence.

Floyd claims that, in the following argument, the prosecutor "improperly attempted to bolster

the credibility of government neuropsychologist Mortillaro" and improperly misstated the facts:

> There were no questions of neuropsychologist Louis Mortillaro because he
> knew what he was talking about and the right tests were applied and they show that
> he has no brain damage, and now I'm talking about some mitigators they have here
> about his mental state.  There was no brain damage, he has an average I.Q., no
> hallucinations, no delusions, not mentally ill.

21

1   Respondents' Exhibit 51, p. 126; *see* Second Amended Petition, p. 200.  The court finds, however,

2   that this argument was fair commentary on the testimony of Dr. Mortillaro.  *See* Testimony of Louis

3   Mortillaro, Ph.D., Exhibit 51, pp. 3-8.

4        Floyd claims that the following arguments of the prosecutor concerning victim impact

5   testimony were improper:

6        -    "What wouldn't Danielle and Gina and Lani and their father Joseph give to
             see Luci smile just one more time?"  (Respondents' Exhibit 51, p. 130); and

7

8        -    "Thomas Darnell.  I don't know how Mona Nall has done it.  You know,
             when you go through the tremendous tragedies together that Mona has
             suffered and had suffered with her son over the years, so many tragedies, so
9            many hardships, there's a bond that forms.  It is just an unbelievable story of
             survival."  (Respondents' Exhibit 51, p. 132).

10

11  *See* Second Amended Petition, p. 201.  This commentary on the victim impact testimony was, in this

12  court's view, measured, in light of the force of the victim impact testimony, was not improper, and

13  certainly did not approach a due process violation.

14       Floyd claims that in the following portion of his closing argument, in the penalty phase of the

15  trial, the prosecutor improperly told the jury that one reason to impose the death penalty was to send

16  a message to others in the community:

17            What are the reasons, ladies and gentlemen, for imposing the death penalty?
             [Penologists] generally come up with two separate reasons for the death penalty:
18           deterrence and punishment.

19            Deterrence because somehow it sends a message to others in our community,
             not just that there is a punishment for a certain crime, but that there is justice, that
20           there is a system that metes out punishment in a proportional manner, that we do not.

21            MR. BROWN [defense counsel]:  I think it's the message to the community
             argument, Judge.

22
              THE COURT:  I think he's organizing a period of chronology, and on that
23           basis it's overrruled.

24            MR. KOOT [prosecutor]:  There is a message to everyone out there that if the
             punishment fits the crime, then we have a system that works.  And the public is
25           entitled to have faith and confidence in their system.  It has deterrence in the other
             way too.  He won't kill again no matter where he is, no matter what state of
26           depression he suffers.

Respondents' Exhibit 51, p. 136; *see* Second Amended Petition, p. 201.  This court finds that this argument was improper.  The decision whether to impose the death penalty must involve "an individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (emphasis omitted).  These comments by the prosecutor cut against that requirement.  However, when taken in context, the prosecutor's comments only purported to provide background information about the death penalty, and did not include any overt instruction to the jury to impose the death penalty in this case to send a message to the community.  Nor did the comments include any attempt to incite the passions of the jurors.  The court finds that these comments were unlikely to mislead the jury, and, at any rate, did not render Floyd's trial unfair.

Finally, with regard to the prosecution's penalty-phase closing arguments, Floyd complains that the prosecutors "improperly attempted to take away the jury's sense of responsibility," in the following comments:

> MR. KOOT [prosecutor]:  Lastly, ladies and gentlemen, and it is always the case, that defense counsel attempts to make this more difficult than it already is, more difficult than it has to be.
>
> Mr. Hedger [defense counsel] suggested, as did Mr. Brown [defense counsel], that you can take the, quote, easy road and impose death.  That is not the easy road.  That is presumptuous on their part.  They have, obviously, never sat where you're sitting.  It is never, ever easy to return this verdict.  Never.  And it's not supposed to be.
>
> But you're not killing him.  You are part of a shared process.
>
> MR. BROWN [defense counsel]:  Objection, Judge.
>
> THE COURT:  What is the objection?
>
> MR. BROWN:  Trying to spread out the responsibility in individualized considerations of the jurors who can't disburse that.
>
> THE COURT:  Overruled.
>
> MR. KOOT:  You  are asked to render a verdict.  The legislature through the people in the state decided that the ultimate punishment would be the death penalty.  And even after you render your verdict, there's a process that continues.

23

1    MR. BROWN:  The responsibility or the jury's duty is to render the verdict.

2    THE COURT:  This is part of their duty.

3    Are you saying something other than that, Mr. Koot?

4    MR. KOOT:  No, I'm not, your Honor.

5    Respondents' Exhibit 51, pp. 138-39; *see* Second Amended Petition, p. 201.  This court finds that

6    these comments were improper to the extent that they minimized the jurors' sense of responsibility

7    for the death sentence.  *See Caldwell v. Mississippi*, 472 U.S. 320 (1985) (improper for prosecution

8    in capital case to suggest that responsibility for determining the appropriateness of the death penalty

9    rests elsewhere, with an appellate court, for example).  The offending comments by the prosecutor,

10   however, were somewhat ambiguous.  Furthermore, reinforcing the weight of the jury's

11   responsibility, the prosecutor stated:  "It is never, ever easy to return this verdict.  Never.  And it's

12   not supposed to be."  Respondents' Exhibit 51, pp. 138-39.  The court finds that while these

13   comments were improper, they were not such as to render Floyd's trial unfair.

14       Taking cumulatively the arguably improper prosecution arguments challenged by Floyd in

15   Claim 10A, the court finds that they did not render Floyd's trial fundamentally unfair, such as to

16   give rise to a violation of his federal constitutional right to due process of law.  *See* discussion, *infra*,

17   pp. 59-63.  The Nevada Supreme Court's denial of relief with respect to Claim 10A was not

18   objectively unreasonable.

19       Regarding Claim 10B, given the court's view of the alleged improper prosecution arguments

20   -- finding that some were improper, but not nearly enough to give rise to a due process violation --

21   the court determines that there was no constitutional violation in the trial court's provision of the

22   transcript of the closing arguments to the jury for use during their deliberations.  *See* Second

23   Amended Petition, pp. 202-03.  The state supreme court's denial of relief with respect to Claim 10B

24   was not objectively unreasonable.

25

26

1      Regarding Claim 10C, Floyd's claim that the State committed misconduct by failing to

2  preserve his blood sample, the court finds that claim to be wholly unsupported and without merit.

3  Claim 10C is, in its entirety, as follows:

4         The state had a responsibility to preserve evidence.  The state cannot be
          allowed to benefit by its failure to preserve evidence, particularly when the state's
5         case is strengthened, and the defendant is unfairly prejudiced.

6         In this case, the state failed to preserve and process the sample of Mr. Floyd's
          blood taken for the purpose of drug and alcohol testing.  It is the belief of Michael
7         Floyd, Mr. Floyd's father, that the state contaminated the blood sample taken from
          Mr. Floyd thereby preventing him from utilizing his own expert to conduct testing.
8         *See* Ex. 365 at ¶ 10.

9  Second Amended Petition, p. 203.  The evidence cited in the claim, paragraph 10 of Petitioner's

10 Exhibit 365, which is the declaration of an investigator, states, in its entirety:

11        During the trial [Michael Floyd] recalled Zane's defense attorneys stating that the
          blood sample taken from Zane, for the [purpose] of conducting the alcohol and drug
12        analysis, had been contaminated.

13 Declaration of Herbert Duzant, Petitioner's Exhibit 365, p. 3, ¶ 10.  Floyd did not add any substance

14 to Claim 10C in his reply.  *See* Reply, p. 42 n.12.  Claim 10C is wholly unsupported and meritless,

15 and the state supreme court's denial of relief with respect to that claim was not objectively

16 unreasonable.

17      Regarding Claim 1D(1) -- Floyd's claim that his trial counsel was ineffective for failing to

18 object to prosecutorial misconduct alleged in Claim 10 -- the court first notes that defense counsel

19 did in fact object to many of the prosecution's alleged improper arguments identified in Claim 10A.

20 To the extent Floyd contends that his counsel was ineffective for not objecting to other alleged

21 improper prosecution arguments, or other alleged prosecutorial misconduct, the court finds that

22 Floyd was not prejudiced.  *See Strickland v. Washington*, 466 U.S. 668, 688 (1984) (A petitioner

23 claiming ineffective assistance of counsel must demonstrate (1) that his attorney's representation

24 "fell below an objective standard of reasonableness," and (2) that the attorney's deficient

25 performance prejudiced the defendant such that "there is a reasonable probability that, but for

26 counsel's unprofessional errors, the result of the proceeding would have been different.").  There is

1   no reasonable probability that the outcome of Floyd's trial would have been different had trial

2   counsel objected to more of the prosecutors' alleged improper arguments, or other prosecutorial

3   misconduct alleged in Claim 10.  The Nevada Supreme Court's denial of relief with respect to that

4   claim of ineffective assistance of trial counsel was not objectively unreasonable.

5   　　　　With respect to the related part of Claim 17A -- Floyd's claim that his appellate counsel

6   was ineffective for failing to raise on appeal claims regarding prosecutorial misconduct alleged in

7   Claim 10 -- the court, here too, finds that Floyd was not prejudiced.  *See Strickland*, 466 U.S. at 688.

8   Many alleged improper prosecution arguments were in fact contested on Floyd's direct appeal, and

9   some of those not challenged on the direct appeal were challenged, and ruled upon by the Nevada

10   Supreme Court, on the appeal in Floyd's first state habeas action.  There is no reasonable probability

11   that the outcome of Floyd's direct appeal would have been different had his appellate counsel raised,

12   on the direct appeal, issues regarding more of the prosecutors' alleged improper arguments, or other

13   prosecutorial misconduct alleged in Claim 10.  The Nevada Supreme Court's denial of relief with

14   respect to that claim of ineffective assistance of appellate counsel was not objectively unreasonable.

15   　　　　As the court understands Floyd's motion for evidentiary hearing, he requests an evidentiary

16   hearing, in part, with respect to Claim 1D(1), Claim 10, and the related part of Claim 17A, so that

17   the court may "ascertain whether counsel had a strategic reason for failing to challenge these issues

18   at the trial level and on direct appeal."  Reply in Support of Motion for Evidentiary (ECF No. 144),

19   p. 2.  The court finds that an evidentiary hearing is not warranted.  As is discussed above, the court

20   finds the state supreme court's rulings on these claims to be objectively reasonable, and therefore

21   rules that Floyd does not satisfy the standard imposed by 28 U.S.C. § 2254(d).  Moreover, regarding

22   the claims of ineffective assistance of counsel in Claims 10 and 1D(1), and the related part of Claim

23   17A, the court's rulings are based solely on the second prong of the *Strickland* standard, the

24   prejudice prong.  It does not matter to the court's rulings on those claims whether or not counsel had

25   a strategic reason for not further challenging, at trial or on direct appeal, prosecutorial misconduct

26   alleged in Claim 10.  In short, Floyd has not shown any need for an evidentiary hearing with respect

to 1D(1) or 10, or the related part of Claim 17A, and the court denies the motion for evidentiary hearing relative to those claims.

The court denies Floyd habeas corpus relief with respect to Claim 1D(1), Claim 10, and the Related Part of Claim 17A, and denies Floyd's motion for an evidentiary hearing with respect to those claims.

Claim 1D(2), and the Related Part of Claim 17A

In Claim 1D(2), Floyd claims that his trial counsel was ineffective for failure to object to the antisympathy jury instruction, and for failure to request a penalty-phase instruction that correctly limited the use of character evidence with respect to the determination that he was eligible for the death penalty.  Second Amended Petition, p. 78.[6]  In Claim 17A, Floyd claims that his appellate counsel was ineffective for failing to raise these jury instruction issues on his direct appeal.  Amendment to Second Amended Petition (ECF No. 95), p. 264.

In the penalty phase of Floyd's trial, the court instructed the jury that "in determining the appropriate penalty to be imposed in this case that it may consider all evidence introduced and instructions given at both the penalty hearing phase of these proceedings and at the trial of this matter."  Exhibit 52, Instruction No. 13.  And, in the guilt phase of the trial, the court had instructed the jury as follows, with a so-called "antisympathy" instruction:

> A verdict may never be influenced by sympathy, prejudice or public opinion. Your decision should be the product of sincere judgment and sound discretion in accordance with these rules of law."

Exhibit 44, Instruction No. 37.  Floyd asserts that "[b]y forbidding the sentencer to take sympathy into account, this language on its face precluded the jury from giving adequate consideration to the

---

[6]  This portion of Claim 1D, designated Claim 1D(2), is set forth in paragraph 176 of Floyd's second amended habeas petition.  In Claim 1D(2), Floyd incorporates all his allegations of improper jury instructions in Claim 6.  In it's ruling on the motion to dismiss, the court found that "[t]his claim was presented to the Nevada courts in Floyd's first post-conviction proceeding, but only with respect to counsel's failure to object to the anti-sympathy jury instruction and the malice instruction and to request a penalty phase instruction that correctly defined the use of character evidence," and, therefore, "the claim is not procedurally defaulted as to those particular claims." *See* Order entered August 20, 2012 (ECF No. 114), p. 10.  Claim 1D(2), however, does not include a claim regarding trial counsel's failure to object to the malice instruction.  *See* Answer, pp. 19-20; Reply, p. 65.

1    evidence concerning Mr. Floyd's character and background, thus effectively negating the

2    constitutional mandate that all mitigating evidence be considered."  Second Amended Petition,

3    p. 177, citing U.S. Const. amends. VIII and XIV.  In Claim 1D(2), Floyd claims that his trial counsel

4    was ineffective for failing to object to the antisympathy instruction.  *Id.* at 78.

5        The Nevada Supreme Court considered this claim on the appeal in Floyd's first state habeas

6    action, and ruled as follows:

> The jury ... received a so-called "antisympathy instruction" in the guilt phase, which
> Floyd contends undermined the jury's obligation to consider all mitigating evidence.
> We have ... rejected this contention where, as here, the jury was instructed to consider
> any mitigating circumstances. [Footnote:  *See Wesley v. State*, 112 Nev. 503, 519,
> 916 P.2d 793, 803-04 (1996).]  Counsel had no basis to challenge [this instruction]
> and were not ineffective.

11   Order of Affirmance, Petitioner's Exhibit 12, pp. 12-13.

12       In *Saffle v. Parks*, 494 U.S. 484 (1990), the United States Supreme Court held as follows:

> We also reject Parks' contention that the antisympathy instruction runs afoul
> of [*Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104
> (1982)] because jurors who react sympathetically to mitigating evidence may
> interpret the instruction as barring them from considering that evidence altogether.
> This argument misapprehends the distinction between allowing the jury to consider
> mitigating evidence and guiding their consideration.  It is no doubt constitutionally
> permissible, if not constitutionally required, *see Gregg v. Georgia*, 428 U.S. 153,
> 189-195, 96 S.Ct. 2909, 2932-2935, 49 L.Ed.2d 859 (1976) (opinion of Stewart,
> Powell, and STEVENS, JJ.), for the State to insist that "the individualized assessment
> of the appropriateness of the death penalty [be] a moral inquiry into the culpability of
> the defendant, and not an emotional response to the mitigating evidence."
> [*California v. Brown*, 479 U.S. 538, 545 (1987) (O'CONNOR, J., concurring)].
> Whether a juror feels sympathy for a capital defendant is more likely to depend on
> that juror's own emotions than on the actual evidence regarding the crime and the
> defendant.  It would be very difficult to reconcile a rule allowing the fate of a
> defendant to turn on the vagaries of particular jurors' emotional sensitivities with our
> longstanding recognition that, above all, capital sentencing must be reliable, accurate,
> and nonarbitrary.  *See Gregg, supra*, 428 U.S., at 189-195, 96 S.Ct., at 2932-2935;
> *Proffitt v. Florida*, 428 U.S. 242, 252-253, 96 S.Ct. 2960, 2966-2967, 49 L.Ed.2d 913
> (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); [*Jurek v. Texas*, 428 U.S.
> 262, 271-72 (1976) (same)]; *Woodson v. North Carolina*, 428 U.S. 280, 303-305, 96
> S.Ct. 2978, 2990-2991, 49 L.Ed.2d 944 (1976) (plurality opinion); *Roberts v.
> Louisiana*, 428 U.S. 325, 333-335, 96 S.Ct. 3001, 3006-3007, 49 L.Ed.2d 974 (1976)
> (plurality opinion).  At the very least, nothing in *Lockett* and *Eddings* prevents the
> State from attempting to ensure reliability and nonarbitrariness by requiring that the
> jury consider and give effect to the defendant's mitigating evidence in the form of a
> "reasoned *moral* response," *Brown*, 479 U.S., at 545, 107 S.Ct., at 841 (emphasis in
> original), rather than an emotional one.  The State must not cut off full and fair

1       consideration of mitigating evidence; but it need not grant the jury the choice to make
      the sentencing decision according to its own whims or caprice.  *See id.*, at 541-543,
2       107 S.Ct., at 839-840.

3 *Saffle*, 494 U.S. at 492-93; *see also Mayfield v. Woodford*, 270 F.3d 915 (9th Cir.2001) (declining to

4 grant certificate of appealability with respect to the same issue), citing *Victor v. Nebraska*, 511 U.S.

5 1, 13 (1994); *Johnson v. Texas*, 509 U.S. 350, 371-72 (1993); *California v. Brown*, 479 U.S. 538,

6 542-43 (1987); *Williams v. Calderon*, 52 F.3d 1465, 1481 (9th Cir.1995).

7       In the penalty phase of Floyd's trial, the jury was given proper instructions concerning the

8 definition and function of mitigating circumstances.  *See* Exhibit 52, Instructions No. 6, 7, 8, 9A, 11,

9 and 12.

10       It is plain, from the Nevada Supreme Court's opinion regarding the antisympathy instruction,

11 and from United States Supreme Court and Ninth Circuit precedent, that any objection by trial

12 counsel to the antisympathy instruction, or any challenge to the antisympathy instruction on Floyd's

13 direct appeal, would have been fruitless.  The Nevada Supreme Court's denial of relief on the claim

14 of ineffective assistance of trial counsel -- that trial counsel was ineffective for not objecting to the

15 anti-sympathy instruction -- and on the claim of ineffective assistance of appellate counsel -- that

16 appellate counsel was ineffective for not challenging the anti-sympathy instruction on the direct

17 appeal -- was not contrary to, or an unreasonable application of, *Strickland, Lockett*, *Eddings*, or any

18 other clearly established federal law, as determined by the Supreme Court of the United States.

19       Floyd also claims in Claim 1D(2) (incorporating the allegations in Claim 6) that his trial

20 counsel were ineffective for failing to request a jury instruction informing the jury that "it must

21 exclude bad character evidence from the weighing process in which the jury determines death

22 eligibility."  *See* Second Amended Petition, pp. 78, 180-81.

23       The Nevada Supreme Court addressed this claim on the appeal in Floyd's first state habeas

24 action, and ruled as follows:

25       Floyd contends that in the penalty phase the jury was not properly instructed
      that it could not consider character evidence in weighing aggravating circumstances
26       against mitigating circumstances.  The jury was not fully instructed on this topic;
      however, we conclude that Floyd was not prejudiced as a result.

This court has held that jurors cannot consider character (or "other matter") evidence "in determining the existence of aggravating circumstances or in weighing them against mitigating circumstances." [Footnote: *Hollaway v. State*, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000); *see also* NRS 175.552(3) (providing that at a penalty hearing, evidence may be presented on aggravating and mitigating circumstances "and on any other matter which the court deems relevant to sentence").] The jury here was instructed that it could impose a sentence of death only if:

> (1) The jurors find unanimously and beyond a reasonable doubt that at least one aggravating circumstance exists; (2) Each and every juror determines that the mitigating circumstance or circumstances, if any, which he or she has found do not outweigh the aggravating circumstance or circumstances; and (3) The jurors unanimously determine that in their discretion a sentence of death is appropriate.

Citing *Byford v. State* [Footnote: 116 Nev. 215, 239, 994 P.2d 700, 716 (2000).], Floyd argues that the jury should have been further instructed that "[e]vidence of any uncharged crimes, bad acts or character evidence cannot be used or considered in determining the existence of the alleged aggravating circumstance or circumstances."

This court in *Byford* approved of both of these instructions, concluding that they properly informed the jury that it could not consider general character evidence until it had determined whether the defendant was eligible for the death penalty. [Footnote: *Id*.] In an earlier opinion, we expressly directed district courts to give the first instruction in capital penalty hearings. [Footnote: *See Geary v. State*, 114 Nev. 100, 105, 952 P.2d 431, 433 (1998) (*Geary II*).] We did not direct in *Byford*, or elsewhere, that the second one be given. [Footnote: 116 Nev. at 239, 994 P.2d at 716.] However, in 2001, a year after both the *Byford* decision and Floyd's trial, this court provided an instruction on this topic for further use. [Footnote: *See Evans v. State*, 117 Nev. 609, 635-36, 28 P.3d 498, 516-17 (2001).] So, it would have been better if the second instruction or an equivalent had been given, but that does not mean that trial counsel's failure to request the instruction was so deficient or prejudicial that it amounted to ineffective assistance.

Trial counsel may not even have acted deficiently since at that time this court had not yet required such an instruction. Assuming counsel reasonably should have requested the instruction, its omission was not prejudicial. As the State points out, Floyd's opening brief does not even describe any character evidence presented by the State. In his reply brief, Floyd points to only two instances of character evidence, both presented in the guilt phase: the testimony of the sexual-assault victim portraying him "as a bad person with 'sick little fantasies'" and evidence that pornographic videos were found in his room. In the context of this quadruple-murder case, the potential prejudicial impact of this evidence appears negligible.

Further, Floyd has not explained why we should fear that jurors improperly considered this evidence in determining the existence or weight of the aggravating circumstances. Although the written instructions did not expressly tell the jurors not to consider such evidence, the jurors were properly instructed on the elements of the three alleged aggravators. Further during the penalty closing argument, the district court correctly informed the jury on this topic after the prosecutor made the following argument:

1          The law does not look at the number of mitigators versus the number

2 of aggravators.  It looks at the total weight.  So what I'm telling you is take
that laundry list [of mitigating circumstances], put them all over there on the
scale and then compare that to this defendant terrorizing, terrorizing three

3 dozen people –

4 Defense counsel objected:  "Not an aggravator, Judge.  Objection."  The district court
sustained the objection "as to the form" of the prosecutor's argument and told the

5 jury:  "The aggravating circumstances are those that Mr. Bell [the prosecutor] just
talked about.  If you find the aggravating circumstances outweigh the mitigating

6 circumstances, *then you can go on to consider other things.*"  (Emphasis added.)
Considering the record as a whole, we conclude that the jurors were sufficiently

7 instructed on this matter, and the presumption is that they followed those instructions.
[Footnote:  *Collman v. State*, 116 Nev. 687, 722, 7 P.3d 426, 448 (2000).]

8

9 Order of Affirmance, Petitioner's Exhibit 12, pp. 12-13.

10        To the extent that Floyd argues that his trial counsel should have sought the additional

11 instruction under state law, the ruling of the Nevada Supreme Court is authoritative and binding;

12 Nevada law did not require such an instruction when Floyd was tried.

13        To the extent that Floyd argues that federal law required such an instruction, and that his trial

14 counsel should have requested the instruction based on federal law, Floyd has not pointed to any

15 United States Supreme Court precedent requiring such an instruction.  Floyd cites *Tuilaepa v.*

16 *California*, 512 U.S. 967 (1994); *Arave v. Creech*, 507 U.S. 463 (1993); *Lowenfield v. Phelps*, 484

17 U.S. 231 (1988); *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Zant v. Stephens*, 462 U.S. 862

18 (1983); *Godfrey v. Georgia*, 446 U.S. 420 (1980); and *Furman v. Georgia*, 408 U.S. 238 (1972).

19 *See* Reply, pp. 60-63.  None of those cases, however, requires a jury instruction such as that

20 suggested by Floyd.

21        Trial counsel was not ineffective for failing to request the jury instruction suggested by

22 Floyd.  And, Floyd's appellate counsel was not ineffective for failing to raise, on his direct appeal,

23 any issue regarding the lack of such a jury instruction.  The Nevada Supreme Court's denial of relief

24 on these claims of ineffective assistance of trial and appellate counsel was not contrary to, or an

25 unreasonable application of any clearly established federal law, as determined by the Supreme Court

26 of the United States.

31

1    In Floyd's motion for evidentiary hearing, he requests an evidentiary hearing, in part, with

2    respect to Claim 1D(2), and the related part of Claim 17A, so that the court may "ascertain whether

3    counsel had a strategic reason for failing to challenge these issues at the trial level and on direct

4    appeal."  Reply in Support of Motion for Evidentiary Hearing, p. 2.  The court finds that an

5    evidentiary hearing is not warranted.  As is discussed above, the court finds the state supreme

6    court's rulings on these claims to be objectively reasonable, and therefore rules that Floyd does not

7    satisfy the standard imposed by 28 U.S.C. § 2254(d).  Moreover, the court's rulings on those claims

8    are based on the court's determination that the antisympathy instruction was not improper and the

9    instruction suggested by Floyd regarding bad character evidence was not required.  It does not

10   matter to the court's rulings whether or not counsel had a strategic reason for not further challenging

11   the jury instructions, either at trial or on Floyd's direct appeal.  Floyd has not shown any need for an

12   evidentiary hearing with respect to Claim 1D(2) and the related part of Claim 17A, and the court,

13   therefore, denies the motion for evidentiary hearing relative to these claims.

14   The court denies Floyd habeas corpus relief with respect to Claim 1D(2), and the related part

15   of Claim 17A.

16   Claim 4B(1)

17   In Claim 4B(1), Floyd claims that "[t]he trial court committed reversible error when it

18   ordered trial counsel to provide the reports and raw data of non-testifying defense mental heath

19   experts."  Second Amended Petition, p. 138.

20   In advance of Floyd's trial, Jakob O. Camp, M.D., Frank Edward Paul, Ph.D., and David L.

21   Schmidt, Ph.D., were appointed as experts for the defense.  On February 15, 2000, the defense filed

22   a notice of expert witnesses, pursuant to NRS 174.234(2), which identified Dr. Camp and Dr. Paul

23   as expert witnesses they intended to present at trial.  Notice of Expert Witnesses, Respondents'

24   Exhibit 88.  On March 17, 2000, the trial court granted the State's motion for reciprocal discovery,

25   and ordered the defense to provide the State with their expert witnesses' reports.  *See* Order

26   Granting State's Motion for Independent Psychiatric Examination and Reciprocal Discovery,

1   Respondents' Exhibit 94.  On June 13, 2000, Floyd filed a Supplemental Notice of Expert

2   Witnesses, stating that "Dr. Schmidt will be testifying to neuropsychological test results and

3   opinions regarding such results."  Supplemental Notice of Expert Witnesses, Respondents' Exhibit

4   101.  On June 15, 2000, therefore, the trial court ordered the defense to provide Dr. Schmidt's

5   written report to the State.  Order, Respondents' Exhibit 102.  At a hearing on July 6, 2000, after

6   they had provided Dr. Schmidt's report to the prosecution, the defense changed its mind, and

7   withdrew its notice of expert witnesses, including Dr. Schmidt.  *See* Transcript of Proceedings of

8   July 6, 2000, Respondents' Exhibit 109, pp. 4-5.  At the penalty phase of the trial, on July 18, 2000,

9   the defense called, as an expert witness, Edward J. Dougherty, Ed.D., to testify regarding Floyd's

10   mental health.  Transcript of Jury Trial, July 18, 2000, Respondents' Exhibit 50, pp. 3-146.  In

11   rebuttal, the prosecution called, as an expert witness, Louis Mortillaro, Ph.D., who testified in part

12   based upon his review of the results of standardized tests administered to Floyd by Dr. Schmidt.

13   *See* Transcript of Jury Trial, July 19, 2000, Respondents' Exhibit 51, pp. 3-38; *see also* Transcript of

14   Jury Trial, July 18, 2000, Respondents' Exhibit 50, pp. 181-92 (trial court's ruling on the issue).

15        Against this factual background, as the court understands Claim 4B(1), Floyd contends that

16   his federal constitutional right to due process of law was violated because the trial court ordered

17   Dr. Schmidt's report, along with the reports of Dr. Camp and Dr. Paul, disclosed to the defense, and

18   allowed Dr. Mortillaro to testify for the prosecution based, in part, on the results of standardized

19   tests administered to Floyd by Dr. Schmidt.  *See* Second Amended Petition, pp. 138-42; Reply,

20   pp. 47-51.  Floyd contends that after the defense made the strategic decision not to call Dr. Schmidt

21   as an expert witness, even though his report had already been provided to the State, Dr. Schmidt's

22   report, and the raw data in it, was no longer available for the State to use at trial.  *See* Reply, pp. 48-

23   51.  Floyd argues: "The fact that Mr. Floyd un-endorsed his expert *after* complying with the trial

24   court's order to disclose his raw data is irrelevant to the analysis."  *Id*. at 51 (emphasis in original).

25        On Floyd's direct appeal, the Nevada Supreme Court ruled, as follows, on this issue:

26            Before trial, Floyd filed a supplemental notice that he might call
         neuropsychologist David L. Schmidt as an expert witness.  Floyd opposed reciprocal

33

discovery, but the district court ordered him to provide the State with Schmidt's report on his examination of Floyd, which included the results of standardized psychological tests administered to Floyd. The defense later unendorsed Schmidt as a witness, and Schmidt did not testify. During the penalty phase of trial, Floyd called a different psychologist, Edward J. Dougherty, Ed.D., to testify regarding Floyd's mental health. In rebuttal and over Floyd's objection, the State called psychologist Louis Mortillaro, Ph.D., who provided his opinion on Floyd's mental status, relying in part on the results from the standardized tests administered by Schmidt. The district court did not permit the State to use anything from Schmidt's report other than the raw test data. Floyd argues that Mortillaro's testimony violated his constitutional rights, relevant Nevada statutes, and his attorney-client privilege.

NRS 174.234(2) provides that in a gross misdemeanor or felony prosecution, a party who intends to call an expert witness during its case in chief must, before trial, file and serve upon the opposing party a written notice containing:

(a) A brief statement regarding the subject matter on which the expert witness is expected to testify and the substance of his testimony;

(b) A copy of the curriculum vitae of the expert witness; and

(c) A copy of all reports made by or at the direction of the expert witness.

NRS 174.245(1)(b) similarly provides in part that the defendant must allow the prosecutor to inspect and copy any "[r]esults or reports of physical or mental examinations, scientific tests or scientific experiments that the defendant intends to introduce in evidence during the case in chief of the defendant." Furthermore, resolution of discovery issues is normally within the district court's discretion. [Footnote: *Lisle v. State*, 113 Nev. 679, 695, 941 P.2d 459, 470 (1997).]

Addressing first the claim that Schmidt's report and test results were privileged work-product, we conclude that it has no merit. "'At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" [Footnote: *Id.* (quoting *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).] NRS 174.245(2)(a) apparently codifies this privilege, providing that "[a]n *internal* report, document or memorandum that is prepared by or on behalf of the defendant or his attorney in connection with the investigation or defense of the case" is not subject to discovery. [Footnote: Emphasis added.] Floyd has failed to show that Schmidt's report or the test results were internal documents representing the mental processes of defense counsel in analyzing and preparing Floyd's case. We conclude that they were discoverable as "[r]esults or reports of physical or mental examinations" that Floyd originally intended to introduce in evidence. [Footnote: NRS 174.245(1)(b); *see also* NRS 174.234(2)(c).]

Next Floyd argues that the State's discovery and use of the Schmidt materials was improper because in his view he did not introduce those materials or any psychological evidence during his "case in chief." NRS 174.234(2) and 174.245(1)(b) require discovery from the defendant only where he intends to call an expert witness or to introduce certain evidence during his "case in chief." Floyd introduced psychological evidence only in the penalty phase, not in the guilt phase, and he assumes that in a capital murder trial "case in chief" refers only to the guilt

phase of the trial, not the penalty phase.  He offers no authority or rationale for this assumption, and we conclude that it is unfounded.

*Black's Law Dictionary* defines "case in chief" as "[t]hat part of a trial in which the party with the initial burden of proof presents his evidence after which he rests." [Footnote: *Black's Law Dictionary* 216 (6th ed.1990).]  The statutes in question refer to "the case in chief of the defendant" as well as "of the state," even though a criminal defendant normally has no burden of proof.  It is clear that the statutes use the term "case in chief" to refer to either party's initial presentation of evidence, in contrast to either's presentation of rebuttal evidence.  This meaning is consistent with the context of discovery:  before trial a party should know and be able to disclose evidence it expects to present in its case in chief, whereas the need for and nature of rebuttal evidence is uncertain before trial.  This meaning is also consistent with the use of the term in this court's case law.  [Footnote: *See*, *e.g.*, *Batson v. State*, 113 Nev. 669, 677, 941 P.2d 478, 483 (1997).]

The State has the burden of proof in both phases of a capital trial:  first, in proving that a defendant is guilty of first-degree murder; and second, if such guilt is proven, in proving that aggravating circumstances exist and are not outweighed by any mitigating circumstances.  In both phases, the defense has the choice of presenting its own case in response to the State's.  Therefore, we conclude that the term "case in chief" in NRS 174.234(2) and 174.245(1)(b) encompasses the initial presentation of evidence by either party in the penalty phase of a capital trial.

Floyd nevertheless maintains that it was improper for the State's expert, who testified in rebuttal, to use the test results obtained by Schmidt after the defense had decided not to call Schmidt as a witness.  We conclude that the use of the evidence here was permissible.

A United States Supreme Court case provides some guidance.  In *Buchanan v. Kentucky*, the Supreme Court considered "whether the admission of findings from a psychiatric examination of petitioner proffered solely to rebut other psychological evidence presented by petitioner violated his Fifth and Sixth Amendment rights where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense." [Footnote: 483 U.S. 402, 404, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).]  The Court concluded that it did not. [Footnote: *Id*. at 421-25, 107 S.Ct. 2906; *see also State v. Fouquette*, 67 Nev. 505, 538, 221 P.2d 404, 421 (1950).]  At his trial, petitioner Buchanan had "attempted to establish the affirmative defense of 'extreme emotional disturbance.'" [Footnote: *Buchanan*, 483 U.S. at 408, 107 S.Ct. 2906.]  He introduced evidence from various evaluations of his mental condition done after an earlier burglary arrest. [Footnote: *Id*. at 409 & n. 9, 107 S.Ct. 2906.]  In response and over Buchanan's objection, the prosecution introduced evidence from a psychological evaluation of Buchanan done at his and the prosecution's joint request after his arrest for the murder in question; Buchanan had not introduced any evidence from the evaluation. [Footnote: *See id*. at 410-12, 107 S.Ct. 2906.]  The Court reasoned that if a defendant "presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." [Footnote: *Id*. at 422-23, 107 S.Ct. 2906.]  The Court noted that Buchanan presented a mental-status defense and introduced psychological evidence, that he did not take the stand, and that the prosecution could respond to this defense only by presenting other psychological evidence. [Footnote: *Id*. at 423, 107 S.Ct. 2906.]  The prosecution

35

1   therefore introduced excerpts from the evaluation requested by Buchanan, which set
    forth the psychiatrist's "general observations about the mental state of petitioner but
2   had not described any statements by petitioner dealing with the crimes for which he
    was charged." [Footnote: *Id.*]  The Court concluded:  "The introduction of such a
3   report for this limited rebuttal purpose does not constitute a Fifth Amendment
    violation." [Footnote: *Id.* at 423-24, 107 S.Ct. 2906.]  Also, since defense counsel
4   had requested the psychological evaluation and was on notice that the prosecution
    would likely use psychological evidence to rebut a mental-status defense, the court
5   concluded that there was no violation of the Sixth Amendment right to counsel.
    [Footnote: *Id.* at 424-25, 107 S.Ct. 2906.]

6
        We conclude that under the circumstances of this case the State's use of
7   evidence obtained from Floyd by his own expert did not violate Floyd's
    constitutional rights.  We rely on a number of factors in reaching this conclusion.
8   First, similar to *Buchanan,* the evidence was used only in rebuttal after Floyd
    introduced evidence of his mental status as a mitigating factor.  Second, the district
9   court restricted the State's use of evidence contained in the defense expert's report to
    the standardized psychological test results. Like *Buchanan,* this evidence did not
10  describe any statements by Floyd dealing with his crimes which could incriminate
    him or aggravate the crimes, nor did it include any conclusions reached by the
11  defense expert.  Third, the jury was not informed that the source of the evidence was
    originally an expert employed by the defense, avoiding the risk of undue prejudice
12  inherent in such information.  [Footnote: *Cf. Lange v. Young,* 869 F.2d 1008, 1014
    (7th Cir.1989); *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038, 1053
13  (E.D.N.Y.1976).]

14  *Floyd*, 118 Nev. at 167-70, 42 P.3d at 256-59.

15      To the extent that the Nevada Supreme Court's ruling was a matter of state discovery and

16  evidentiary rules, it is not a subject of this federal habeas corpus petition.  *See* 28 U.S.C. § 2254(a)

17  (federal court may entertain an application for a writ of habeas corpus "only on the ground that [the

18  petitioner] is in custody in violation of the Constitution or laws or treaties of the United States").

19  The question here is whether the Nevada Supreme Court's ruling that Floyd's federal due process

20  rights were not violated was contrary to, or an unreasonable application of, clearly established

21  federal law, as determined by the Supreme Court of the United States.  *See* 28 U.S.C. § 2254(d).

22      An evidentiary ruling violates a defendant's federal constitutional right to due process of

23  law, and is therefore a basis for federal habeas relief, only if it renders the trial "fundamentally

24  unfair."  *See Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir.2008); *Windham v. Merkle*, 163

25  F.3d 1092, 1103 (9th Cir.1998).

26

36

1          The Nevada Supreme Court cited *Buchanan* in determining that Floyd's federal due process

2     rights were not violated.  In *Buchanan*, the United States Supreme Court allowed the prosecution to

3     use, at trial, evidence obtained at a pre-trial psychiatric evaluation to rebut the defendant's

4     presentation of contrary psychiatric reports.  *Buchanan*, 483 U.S. at 424.  The Supreme Court noted

5     that "if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the

6     very least, the prosecution may rebut this presentation with evidence from the reports of the

7     examination that the defendant requested."  *Id*. at 422-23.  The defense in *Buchanan* had filed a

8     request to initiate an examination for involuntary hospitalization, and then, at trial, relied on the

9     "mental status" defense of extreme emotional disturbance; therefore, the State was allowed to

10    introduce evidence from the involuntary hospitalization examination to rebut other psychiatric

11    evidence.  *Id*. at 423-24.  The Nevada Supreme Court did not unreasonably look to *Buchanan* for

12    guidance, and did not unreasonably apply that precedent in its ruling in this case.  *See Floyd*, 118

13    Nev. at 169., 42 P.3d at 258.

14         The prosecution expert witness' testimony based on Dr. Schmidt's raw data did not render

15    Floyd's trial fundamentally unfair.  The defense listed Dr. Schmidt as a testifying expert, and,

16    consequently, provided Dr. Schmidt's test results to the prosecution.  Then, at trial, after the defense

17    changed its mind and put on another expert to testify regarding Floyd's mental health, the

18    prosecution called Dr. Mortillaro as a rebuttal witness, and Dr. Mortillaro testified regarding his

19    opinions -- not the opinions of Dr. Schmidt -- using the results of the standardized psychological

20    tests administered by Dr. Schmidt.  Under these circumstances, which resulted from the defense

21    identifying Dr. Schmidt as a testifying expert and turning over his data and report, and then

22    changing their mind about Dr. Schmidt testifying, Dr. Mortillaro's testimony did not render Floyd's

23    trial fundamentally unfair.  *See* discussion, *infra*, pp. 59-63.

24         Floyd argues that the Nevada Supreme Court unreasonably applied the Supreme Court

25    decision in *United States v. Nobles*, 422 U.S. 225 (1975).  *See* Reply, pp. 48-49.  In this case,

26    however, unlike in *Nobles*, the defense voluntarily disclosed Dr. Schmidt's data and report to the

prosecution, after giving notice that it intended to call Dr. Schmidt as an expert witness. *Nobles* is inapposite.

Floyd also cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), and *Smith v. McCormick*, 914 F.2d 1153 (9th Cir.1990). In *Ake*, the Supreme Court held that "when an indigent defendant places his mental state at issue, 'the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.'" *Smith v. McCormick*, 914 F.2d at 1157 (quoting *Ake*, 470 U.S. at 83). In *Smith v. McCormick*, the Ninth Circuit Court of Appeals held that the *Ake* rule had been violated because, instead of appointing a defense psychiatrist for the defendant, the trial court appointed a "neutral" psychiatrist, who was to report the results of his examination directly to the court. *See Smith v. McCormick*, 914 F.2d at 1157 ("The right to psychiatric assistance does not mean the right to place the report of a "neutral" psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate -- including to decide, with the psychiatris's assistance, not to present to the court particular claims of mental impairment."). In this case, there was no violation of the rule of *Ake*; Floyd was provided ample psychiatric assistance. And, unlike in *Smith v. McCormick*, Floyd was not unfairly compelled to disclose any of his appointed doctors' data or opinions; Floyd did so of his own accord, after designating them as testifying experts.

Floyd does not show that the Nevada Supreme Court's ruling on his federal constitutional due process claim was contrary to, or an unreasonable application of, *Buchanan*, *Nobles*, or *Ake*, or any other United States Supreme Court precedent. The Court denies Floyd habeas corpus relief with respect to Claim 4B(1).

Claims 4B(5) and 9

In Claim 4B(5), Floyd claims that the trial court "erred by failing to sever the sexual assault claims from the murder claims." Second Amended Petition, p. 145. Similarly, in Claim 9, Floyd claims that his conviction and death sentence are unconstitutional "because of the trial court's failure

1    to grant a motion to sever counts relating to events at his apartment from those relating to events at

2    the Albertson's." *Id*. at 192.

3        On Floyd's direct appeal, the Nevada Supreme Court ruled as follows with respect to this

4    claim:

5            Before trial, Floyd moved unsuccessfully to sever the counts relating to the
          events at his apartment from those relating to the events at the supermarket. Floyd
6         contends that two independent episodes were involved and therefore joinder of the
          charges was improper and prejudiced him. He quotes the Supreme Court of
7         California:

8            When a trial court considering a defendant's motion for severance of
          unrelated counts has determined that the evidence of the joined offenses is not
9         "cross-admissible," it must then assess the relative strength of the evidence as
          to each group of severable counts and weigh the potential impact of the jury's
10        consideration of "other crimes" evidence. I.e., the court must assess the
          likelihood that a jury not otherwise convinced beyond a reasonable doubt of
11        the defendant's guilt of one or more of the charged offenses might permit the
          knowledge of the defendant's other criminal activity to tip the balance and
12        convict him. If the court finds a likelihood that this may occur, severance
          should be granted.

13
     [Footnote: *People v. Bean*, 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996, 1006
14   (1988) (citation omitted).] This appears to be a sound statement of law, but it is not
     applicable here. The California court was considering the joinder of "unrelated
15   counts." We conclude that the counts here were related and that the evidence of each
     set of crimes was relevant and admissible to prove the other.

16
            NRS 173.115 provides that multiple offenses may be charged in the same
17   information if the offenses charged are based either "on the same act or transaction"
     or "on two or more acts or transactions connected together or constituting parts of a
18   common scheme or plan." Also, if "evidence of one charge would be
     cross-admissible in evidence at a separate trial on another charge, then both charges
19   may be tried together and need not be severed." [Footnote: *Mitchell v. State*, 105
     Nev. 735, 738, 782 P.2d 1340, 1342 (1989).] Here, joinder was proper because the
20   acts charged were at the very least "connected together." The crimes at the
     supermarket began only about fifteen minutes after the crimes at the apartment ended,
21   and Floyd used the same shotgun in committing both sets of crimes. Moreover, his
     actions and statements in committing the crimes at his apartment were particularly
22   relevant to the question of premeditation and deliberation regarding the murders at the
     supermarket. Likewise, Floyd's actions and demeanor and possession of the
23   shotgun at the supermarket corroborated the testimony of the sexual assault victim
     and would have been relevant, at a separate trial, to prove more than just Floyd's
24   character. Thus, the evidence of the two sets of crimes was cross-admissible.
     [Footnote: *See* NRS 48.045(2); *Middleton v. State*, 114 Nev. 1089, 1108, 968 P.2d
25   296, 309 (1998).]

26          Even if joinder is permissible under NRS 173.115, a trial court should sever
     the offenses if the joinder is "unfairly prejudicial." [Footnote: *Middleton*, 114 Nev.

at 1107, 968 P.2d at 309.]  NRS 174.165(1) provides that if a defendant is prejudiced by joinder of offenses, the district court may order separate trials of counts "or provide whatever other relief justice requires."  Floyd quotes the Montana Supreme Court regarding the types of prejudice that can result from joinder of charges:

> The first kind of prejudice results when the jury considers a person facing multiple charges to be a bad man and tends to accumulate evidence against him until it finds him guilty of something.  The second type of prejudice manifests itself when proof of guilt on the first count in an information is used to convict the defendant of a second count even though the proof would be inadmissible at a separate trial on the second count.  The third kind of prejudice occurs when the defendant wishes to testify on his own behalf on one charge but not on another.

[Footnote:  *State v. Campbell*, 189 Mont. 107, 615 P.2d 190, 198 (1980).]

> The decision to sever is within the discretion of the district court, and an appellant has the "heavy burden" of showing that the court abused its discretion. [Footnote:  *Amen v. State*, 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990).]  To establish that joinder was prejudicial "requires more than a mere showing that severance might have made acquittal more likely."  [Footnote:  *United States v. Wilson*, 715 F.2d 1164, 1171 (7th Cir.1983).]  We conclude that Floyd has not shown that he was unfairly prejudiced by joinder of charges.  The evidence of the burglary, murders, and attempted murder was overwhelming.  The evidence of the kidnapping and sexual assaults was substantial and uncontradicted.  He has not shown that the jury improperly accumulated evidence against him, that it used the proof of one count improperly to convict him of another count, or that the joinder prevented him from testifying on any charges.  Thus the district court did not err in denying Floyd's motion to sever the charges.

*Floyd*, 118 Nev. at 163-65, 42 P.3d at 254-55.

In challenging the Nevada Supreme Court's ruling, Floyd cites *United States v. Lane*, 474 U.S. 438 (1986).  *See* Second Amended Petition, pp. 145, 192-94; Reply, pp. 54-56.  However, the Ninth Circuit Court of Appeals has observed that the United States Supreme Court has never held that a state court's denial of a motion to sever can, in itself, violate the federal constitution.  *See Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir.2012); *Collins v. Runnels*, 603 F.3d 1127, 1131 (9th Cir.2010).  Regarding *Lane*, the Supreme Court case cited by Floyd*, and *Zafiro v. United States*, 506 U.S. 534 (1993), the court in *Runningeagle* stated:

> ... [W]e have explicitly concluded that *Zafiro* and *Lane* do not "establish a constitutional standard binding on the states and requiring severance in cases where defendants present mutually antagonistic defenses."  *Collins v. Runnels*, 603 F.3d 1127, 1131 (9th Cir.2010).  In reaching that holding, we found that the statement in *Lane* regarding when misjoinder rises to the level of constitutional violation was dicta and that *Zafiro* is not binding on the state courts because it addresses the Federal

1   Rules of Criminal Procedure.  *Id*. at 1131-33.  Neither decision is "clearly established
2   Federal law" sufficient to support a habeas challenge under § 2254.  *Id*.

3   *Runningeagle*, 686 F.3d at 776-77.  Therefore, in light of *Runningeagle* and *Collins*, Floyd does not

4   show the Nevada Supreme Court's ruling to be contrary to, or an unreasonable application of, any

5   "clearly established Federal law, as determined by the Supreme Court of the United States."  *See*

6   28 U.S.C. § 2254(d).

7   Moreover, under the circumstances of this case, this court finds that there is no question that

8   the denial of the motion to sever was correct.  As the Nevada Supreme Court explained, the charges

9   regarding the events at Floyd's apartment were closely related to the charges regarding the events at

10   the supermarket.  There was plainly significant evidentiary overlap between the two sets of charges.

11   The court finds Floyd's claims in this regard to be completely meritless.

12   The court denies Floyd habeas corpus relief with respect to Claims 4B(5) and 9.

13   <u>Claim 5</u>

14   In Claim 5, Floyd claims that his constitutional rights were violated "because of the trial

15   court's failure to grant a change of venue and sequester the jury."  Second Amended Petition, p. 149.

16   The Nevada Supreme Court ruled on this claim as follows on Floyd's direct appeal:

17   The district court denied Floyd's motion for a change of venue.  He claims
     that this was error because jurors were biased by the extensive and prominent
18   coverage of his case by the print and broadcast media in Las Vegas.  The State does
     not dispute that the media coverage of the case was massive.  It simply points out that
19   Floyd presents no evidence that this coverage resulted in bias on the part of any juror.

20   NRS 174.455(1) provides that a criminal action "may be removed from the
     court in which it is pending, on application of the defendant or state, on the ground
21   that a fair and impartial trial cannot be had in the county where the indictment,
     information or complaint is pending."  Whether to change venue is within the sound
22   discretion of the district court and will not be disturbed absent a clear abuse of
     discretion. [Footnote:  *Sonner v. State*, 112 Nev. 1328, 1336, 930 P.2d 707, 712
23   (1996), *modified on rehearing on other grounds*, 114 Nev. 321, 955 P.2d 673
     (1998).]  A defendant seeking to change venue must not only present evidence of
24   inflammatory pretrial publicity but must demonstrate actual bias on the part of the
     jury empaneled.  *Id*.  Even where pretrial publicity has been pervasive, this court has
25   upheld the denial of motions for change of venue where the jurors assured the district
     court during voir dire that they would be fair and impartial in their deliberations.
26   [Footnote:  *Id*. at 1336, 930 P.2d at 712-13; *see also Ford v. State*, 102 Nev. 126,
     129-32, 717 P.2d 27, 29-31 (1986).]

41

1    Floyd does not point to evidence that any empaneled juror was biased and
2 does not even refer to the voir dire of the prospective jurors.  Review of the voir dire
 shows that when asked about pretrial publicity, the jurors who were ultimately
3 empaneled indicated that it would not influence their decision.  It appears that every
 juror also expressed a willingness to consider sentences other than death in the event
4 of a guilty verdict.  We conclude that the district court did not err in denying the
 motion for a change of venue.

5 *Floyd*, 118 Nev. at 165, 42 P.3d at 255-56.

6    Floyd argues that "[t]he Nevada Supreme Court applied the wrong standard by ruling that

7 Mr. Floyd failed to demonstrate that his jurors were biased by the pretrial publicity, without

8 considering whether this was a case where bias should be presumed."  Reply, p. 51.

9    In the Nevada Supreme Court's ruling, there appears to be no analysis of Floyd's federal

10 constitutional claim, whether based on actual or presumed bias.  "When a federal claim has been

11 presented to a state court and the state court has denied relief, it may be presumed that the state court

12 adjudicated the claim on the merits in the absence of any indication or state-law procedural

13 principles to the contrary."  *Harrington*, 131 S.Ct. at 784-85.  "Where a state court's decision is

14 unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there

15 was no reasonable basis for the state court to deny relief."  *Id*. at 784.

16    Criminal defendants are entitled to "a fair trial by a panel of impartial, indifferent jurors."

17 *Hayes v. Ayers*, 632 F.3d 500, 507 (9th Cir.2011) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722

18 (1961)); *see also Estrada v. Scribner*, 512 F.3d 1227, 1239-40 (9th Cir.2008) (even a single juror's

19 prejudice can violate the defendant's right to an impartial jury).  The Constitution does not,

20 however, require that jurors "be totally ignorant of the facts and issues involved."  *Mu'Min v.*

21 *Virginia*, 500 U.S. 415, 430 (1991) (internal quotation marks omitted); *see also Skilling v. United*

22 *States*, 561 U.S. 358, 380-81 (2010).  "The relevant question is not whether the community

23 remembered the case, but whether the jurors ... had such fixed opinions that they could not judge

24 impartially the guilt of the defendant."  *Mu'Min*, 500 U.S. at 430 (internal quotation marks omitted).

25    Jurors' prejudice may be actual or presumed.  *Hayes*, 632 F.3d at 508.  Prejudice is presumed

26 "'when the record demonstrates that the community where the trial was held was saturated with

1  prejudicial and inflammatory media publicity about the crime.'"  *Id.* (quoting *Harris v. Pulley*, 885

2  F.2d 1354, 1361 (9th Cir.1988)).  However, a "presumption of prejudice ... attends only the extreme

3  case."  *Skilling*, 561 U.S. at 381.  Actual prejudice exists "when voir dire reveals that the jury pool

4  harbors 'actual partiality or hostility [against the defendant] that [cannot] be laid aside.'"  *Hayes*,

5  632 F.3d at 508 (quoting *Harris*, 885 F.2d at 1363).

6         A trial court's decision that a juror is fit to render a verdict is entitled to "special deference."

7  *Mu'Min*, 500 U.S. at 433.  The Supreme Court has emphasized that jury selection "is particularly

8  within the province of the trial judge" because "in-the-moment voir dire affords the trial court a

9  more intimate and immediate basis for assessing a venire member's fitness for jury service."

10  *Skilling*, 561 U.S. at 386 (internal quotation marks and citations omitted).

11         Regarding Floyd's contention that certain jurors harbored an actual bias against him, as a

12  result of their exposure to media coverage of his trial, Floyd did nothing to attempt to substantiate

13  such a claim in the trial court or on his direct appeal.  *See* Motion for Change of Venue,

14  Respondents' Exhibit 69; Supplemental Motion for Change of Venue and Reply to State's

15  Opposition, Respondents' Exhibit 77; Supplemental Exhibit to Motion for Change of Venue,

16  Respondents' Exhibit 81; Motion to Sequester Jurors, Respondents' Exhibit 78; Motion for New

17  Trial, Respondents' Exhibit 117, pp. 7-10; Appellant's Opening Brief, Respondents' Exhibit 4,

18  pp. 21-27; Appellant's Reply Brief, Respondents' Exhibit 6, pp. 6-8.  Floyd did not specifically

19  mention, in either his argument in the trial court or his argument before the Nevada Supreme Court,

20  any of the three jurors that he now claims to have been biased against him.  *See id.*  Floyd did not

21  refer either the trial court or the Nevada Supreme Court to those three jurors' juror questionnaires, or

22  to the transcript of their voir dire.  *See id.*  Even in this court, regarding the alleged bias of the three

23  jurors, in his one-paragraph argument in his second amended petition, Floyd takes only a very

24  limited view of the evidence regarding the three jurors' views.  *See* Second Amended Petition,

25  p. 167.  Taking into consideration the three jurors' jury questionnaires and their voir dire, this court

26  finds that there is no showing that any of those three jurors had such a fixed opinion that they could

1    not act as impartial jurors, or that they were unable to put aside whatever they had heard about the

2    case before trial and render an unbiased verdict.  *See* Juror Questionnaire, Petitioner's Exhibit 391

3    (Juror McGee's juror questionnaire); Transcript of Jury Trial, July 11, 2000, Respondents' Exhibit

4    37, pp. 33-37 (Juror McGee's voir dire); Petitioner's Exhibit 392 (Juror Caven's juror

5    questionnaire); Respondents' Exhibit 37, pp. 49-51 (Juror Caven's voir dire); Petitioner's Exhibit

6    393 (Juror Luebstorf's juror questionnaire); Respondents' Exhibit 38, pp. 89-98 (Juror Leubstorf's

7    voir dire).  The court finds objectively reasonable the Nevada Supreme Court's determination that

8    there was no actual juror bias against Floyd.

9        Floyd focuses most of his argument regarding Claim 5 on his contention that the media

10   coverage of his case was so extensive that the prejudice of the jury should be presumed.  *See* Second

11   Amended Petition, pp. 149-68; Reply, pp. 51-54.

12       In support of his presumed prejudice argument, Floyd has submitted, as exhibits, copies of

13   some 115 newspaper articles concerning his case.  *See* Petitioner's Exhibits 150-263.  In their

14   answer, respondents stated that those articles "are not part of any state court record."  Answer, p. 27.

15   In his reply, Floyd did not respond to that assertion.  *See* Reply, pp. 51-54.  In fact, of the 115

16   newspaper articles submitted by Floyd as exhibits, only three of them were before the state courts:

17   one of the two articles in Petitioner's Exhibit 190, the article in Petitioner's Exhibit 210, and the

18   article in Petitioner's Exhibit 211.  *See* Motion for Change of Venue, Respondents' Exhibit 69;

19   Opposition to Motion for Change of Venue, Respondents' Exhibit 75; Supplemental Motion for

20   Change of Venue and Reply to State's Opposition, Respondents' Exhibit 77; Supplemental Exhibit

21   to Motion for Change of Venue, Respondents' Exhibit 81.  "[R]eview under § 2254(d)(1) is limited

22   to the record that was before the state court that adjudicated the claim on the merits."  *Cullen*, 131

23   S.Ct. at 1398.  In *Cullen*, the Court reasoned that the "backward-looking language" present in

24   § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and,

25   therefore, the record under review must be "limited to the record in existence at that same time i.e.,

26   the record before the state court."  *Id.*  Therefore, in ruling on this claim under 28 U.S.C. § 2254(d),

44

this court does not consider evidence that was not submitted to the state courts; regarding the extent and nature of the media coverage of Floyd's case, the court considers only the exhibits submitted by Floyd in support of his motion for change of venue. *See* Motion for Change of Venue, Respondents' Exhibit 69; Opposition to Motion for Change of Venue, Respondents' Exhibit 75; Supplemental Motion for Change of Venue and Reply to State's Opposition, Respondents' Exhibit 77; Supplemental Exhibit to Motion for Change of Venue, Respondents' Exhibit 81.

In *Skilling*, commenting on its previous holdings in *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Court stated:

> In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 798-799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See also, e.g., Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*.

*Skilling*, 561 U.S. 380-81 (footnotes omitted) (emphasis in original). Floyd has shown that his case was covered extensively by the Las Vegas news media, but, as the *Skilling* Court instructed, prominence does not necessarily produce prejudice. Floyd has not shown that Las Vegas was saturated with prejudicial and inflammatory media publicity about his crimes, or that the atmosphere of his trial was corrupted by the media coverage. The court finds that the Nevada Supreme Court's ruling, that this was not an extreme case where prejudice from media coverage must be presumed, was objectively reasonable.

Floyd does not show the Nevada Supreme Court's ruling on his claim in Claim 5 of his second amended petition to be contrary to, or an unreasonable application of, any "clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d). The court denies Floyd habeas corpus relief with respect to Claim 5.

1    <u>Claim 7</u>

2    In Claim 7, Floyd claims that "Nevada law fails to properly channel death sentences by

3    limiting the scope of victim-impact testimony." Second Amended Petition, p. 182. Floyd contends

4    that his federal constitutional rights were, as a result, violated in two ways: Floyd contends that his

5    rights were violated on account of his trial counsel's failure to object to comments about the victims

6    made by a prosecutor in the State's opening statement at the guilt phase of his trial, and Floyd

7    contends that his rights were violated by the testimony of Mona Nall at the penalty phase of his trial.

8    *See id*. at 182-88.[7]

9    Regarding the State's opening statement in the guilt phase of his trial, Floyd contends that

10   his trial counsel should have objected to the following remarks of the prosecutor regarding the

11   people Floyd shot at the grocery store:

12   When he got to that east door, first person he saw was a fellow by the name of
     Thomas Darnell. Thomas Darnell was a 40 year old young man. He had suffered
13   some childhood illnesses that left him mentally impaired. He lived home with his
     mother and father. He worked as a courtesy clerk. It was his job to pick up the carts
14   and bring them back into the store. And he was pushing the carts in from the parking
     lot. Zane Floyd ran up from the back, threw off his robe and shot him in the back.
15
                                             *   *   *
16
     Zane Floyd moved up aisle 7, and the next person he confronted was a fellow
17   by the name of Chuck Leos. Chuck Leos was 41, just celebrated his first anniversary
     to his wife, Leanne. He was the frozen food man. He shot him on the right side, in
18   the neck and the face; two shots from that shotgun.

19   He saw Dennis Troy Sargent. Troy Sargent was the night manager. He was
     the boss there, a young man with a six year old son. Zane Floyd shot him once
20   straight on in the chest.

21                                           *   *   *

22   He went into the back room area and found the only person that wasn't hiding
     that didn't realize what was going on. Her name was Lucy Tarantino. She was in her
23   early Sixties. She was a wife, mother of three, grandmother. She was the salad lady.
     It was her job to get the salad stuff ready.

24

25   _____

26         [7] In Claim 17A, Floyd asserted that his appellate counsel was ineffective for failing to raise all
     aspects of this claim on his direct appeal. Amendment to Second Amended Petition (ECF No. 95),
     p. 264. Floyd has abandoned that claim. *See* Reply, p. 37 n.9.

1                                           *     *     *

2              Lucy Tarantino was shot the top of her head, and there is nothing left but her
       lower jaw.  Everything else just exploded and left.

3

4    Transcript of Jury Trial, July 11, 2000, Exhibit 38, pp. 145-50; *see also* Second Amended Petition,

5    pp. 182-83.

6              On the appeal in his first state habeas action, the Nevada Supreme Court ruled as follows:

7              Floyd also claims that his counsel were ineffective in failing to challenge two
       remarks by the prosecutor in the opening statement of the guilt phase.  The prosecutor
8      was describing two of the murder victims.  He told the jury that "Chuck Leos was 41,
       just celebrated his first anniversary to his wife, Leanne," and that "Lucy Tarantino ...
9      was in her early sixties.  She was a wife, mother of three, grandmother."  Floyd
       argues that this was victim impact evidence which was highly prejudicial and
10     inadmissible in the guilt phase.  This argument is unpersuasive.  The prosecutor's
       remarks were not inflammatory, and "facts establishing a victim's identity and
11     general background" are admissible.  [Footnote:  *Libby v. State*, 109 Nev. 905, 916,
       859 P.2d 1050, 1057 (1993), *vacated on other grounds*, 516 U.S. 1037 (1996).]
12     Again Floyd's counsel were not ineffective.

13   Order of Affirmance, Petitioner's Exhibit 12, pp. 7-8.

14             To the extent that the Nevada Supreme Court ruled that the prosecutor's remarks were

15   allowable under state law, and that any objection under state law would have been futile, that court's

16   ruling is authoritative and not subject to review in this federal habeas corpus action.  Floyd does not

17   point to any federal law holding such general background information about the victims, in the guilt

18   phase of the trial, to be inadmissible.  Floyd cites only *Payne v. Tennessee*, 501 U.S. 808 (1991), but

19   the Court in *Payne* did not address the question of the introduction of such basic victim background

20   information in the guilt phase of a capital trial.  In short, Floyd makes no showing that the

21   challenged remarks in the State's opening statement were improper and subject to any valid

22   objection.  There is no showing that Floyd's trial counsel was ineffective for not objecting to those

23   remarks.  *See Strickland*, 466 U.S. at 688.  The Nevada Supreme Court's denial of relief on this

24   claim of ineffective assistance of trial counsel was not contrary to, or an unreasonable application of,

25   *Strickland*, or any other clearly established federal law, as determined by the Supreme Court of the

26   United States.

                                               47

1    With regard to the testimony of Mona Nall in the penalty phase of his trial, Floyd contends

2    that his trial was rendered unfair, and his federal constitutional right to due process of law was

3    violated, as a result of her testimony, which was as follows:

4         Q.    You're Thomas Darnell's mother?

5         A.    Yes, I am.

6                              *    *    *

7         Q.    Thomas was a unique individual; is that right?

8         A.    He was extremely unique.

9         Q.    And part of that actually relates from the time he was born?

10        A.    He was born premature, and when he was five weeks old, he contacted
     meningococcal meningitis.  At that time was when only – this is one of the seven
11    different types of meningitis, and it was the killer.  People found out you had it
     during an autopsy because you didn't live more than 24 hours.  And he was a premie
12    and only five weeks old.

13        He was rushed to Children's Hospital in San Diego and they gave me his life
     expectancy:  twenty-five minutes; to twenty-five minutes.  They knew he wasn't
14    going to live.  I consented to treatment that was strictly experimental and they jetted
     in a team from UCLA Medical Center to San Diego, and by the grace of God and
15    medical technology Tommy lived, but he was also in a coma for 35 days.

16        This little body, five-week-old premie, his head looked like it was bigger than
     the rest of his body, and he was totally bent backwards with the heels touching the
17    back of his head.

18        Tommy lived, but it followed many years of medical rehabilitation, and at the
     end, Tommy's little body made a major breakthrough.  That's why people when they
19    get meningitis now, they have a treatment.  He was one of the first.

20        When he was six years old, I enrolled him in Ansel Tyne School Hospital in
     San Diego.  Here, again, this very unique place, they dealt mainly with diseases and
21    neurological disorders from accidents, people been in comas.  And they take the
     person, whether it's a child or an adult, and they make him lay and do nothing, and
22    they teach him how to take one finger.  What they're doing is taking and building a
     bridge from the damaged brain cells to the many unused brain cells that we have, so
23    that when that person is finished with all the treatment, the years of treatment, they
     have a new brain actually.

24
          And they lay and they lift one finger.  They can't feed themselves.  They have
25    to be fed.  They go to a point of learning to roll over, to crawl, to learning to feed,
     walk forward for balance.

26

48

1       And Tommy being so young, it put him quite behind in school.  But he went
2  through this.  The only one major outcome he had was that he ran funny.  It was kind
   of funny when he ran.  And it was very hard on him, and it took a lot of
   encouragement, took a lot of fortitude.  An exceptional person just to make it through
3  that, and --

4       Q.      The meningitis left some neurological damage?

5       A.      Yeah.  Mainly because the coma that he was in.  And sometimes
   people ask me, "Well, is he retarded?"  No, Tommy was not retarded.  He was the
6  farthest thing from it.  He would be a little slow in response, but he was very, very
   intelligent.

7
        If you were doing some type of math and adding up a column of figures and
8  using a calculator, before you pushed the total button, he'd give you the answer by
   looking at it.

9
        Q.      So he had slow thought processes in other areas though?
10
        A.      Yes.
11
        Q.      Did that cause him any difficulty as a youth?
12
        A.      It did with making associations with other people.  It was extremely
13 hard because Tommy was in 16 different schools.  He was a military child, and
   because of his father's background and the area of intelligence that he was in, it
14 forced us to be transferred a tremendous amount of times.  So not only did Tommy
   have a physical point working against him, he also had a social aspect working
15 against him because of being in so many different schools.

16      Q.      When Tommy was 14, there was a traumatic event in his life?

17      A.      Yes.  I'd like to back up.

18      Q.      Go ahead.

19      A.      Just a brief comment.

20      Prior to his 14th year, because of his father being in the military, he also went
   through the point of when his father was missing in action and also the point that his
21 father was never around  to really give him the guidance.  So he had a father he
   looked up to in a picture but who was most of the time not physically there for him.

22
        When Tommy was 14, his father had just gotten out of the Navy, had just
23 taken an early retirement, and his father was killed by a person on alcohol and drugs
   and a million excuses.  But it still -- it took my husband away from me, and it took
24 Tommy's father away from him and from his sisters.

25      Q.      Did Tommy succeed in graduating from high school?

26      A.      Tommy graduated from high school and he also got a year of college.
   Was extremely difficult for him because of the background.  I mean, we went the

49

1  regular classes, special education, the modified classes, but he graduated with a
2  regular high school diploma.  To get there, he would sit at night, sometimes until
   midnight studying because there's something he just -- he couldn't quite comprehend,
   but he had a great determination that he was going to succeed and he would not let
3  anything get him down.

4          And during this time that he was trying to work to get a diploma for himself,
   part of his school program, he tutored every day at the elementary school, in math of
5  course, to help kids that were like him at one time, but so that they could do
   something.  He also volunteered three straight years every day at the veteran's
6  hospital in Albuquerque.  So he started early on.  Through his own pain, he knew
   how to give back and try to get back with love.

7
        Q.      There came a time that -- Tommy lived at home his entire life, did he
8  not, with you?

9          A.      Yes.

10         Q.      After his father was killed, you remarried?

11         A.      Yes, I did.

12         Q.      Tell me about Tommy's relationship with his stepdad.

13         A.      Well, he never referred to him as a stepdad.  His relationship with my
   husband is very -- was very, very close.  He always called him Dad from the
14  beginning.  They did a lot of things together.  They talked.  My husband is a
   musician.  At times he got Tommy involved when he was -- got to be a roady with a
15  band, couple bands, in addition to working his regular life.

16         And he -- everybody loved him.  The hurt has gone so deep for every member.
   The loss of Tommy hurts just as much as if it had been his natural son.

17
        For his niece, Tori lived at home since she was a couple months old.  She's 15
18  now.  She's gone from being a straight A student to this year she's -- her grades went
   down, but she's had a tremendous amount of coping.  Tommy was a
19  brother/uncle/father figure.  He was always there for her.  He tutored her.  He never
   missed not one -- not one school function that she had.  He'd always just go around
20  saying, "That's my kid."

21         Q.      Now, there came a time when Tommy was an adult where he lived in
   Colorado, and there was another traumatizing event in his life; is that right?

22
        A.      Seemed like a life of trauma.

23         Q.      Would you share that with us or give us some insight?

24
        A.      Tommy was coming home from work at the bus stop and two thugs
25  came up to him at gun and knife point.  They took his wallet.  Started off as a
   robbery, I was told, and they saw he had a local address, and they had cars, so they
26  took and -- they were transient people.  And they drove to our house arriving at about
   one o'clock in the morning.  I was up and waiting for Tommy.  And I saw him get out

                                         50

1    of the car, and I saw this one person holding onto Tommy and Tommy was limping.
     He looked like he was hurt.  They came to the door and I let them in naturally --

2
     MR. BROWN [defense counsel]:     Your Honor, I apologize.  I think this

3    might be getting a little off track.

4          THE COURT:     Sustained.

5          MR. BELL [prosecutor]:     Well, Judge, I think we're going to get to the
     point where it's going to be relevant because it shows who he is.

6
           THE COURT:     I'll permit some leading.

7          MR. BELL:  Thank you.

8    BY MR. BELL:

9          Q.     Were you and your husband and your daughter and Tommy held

10   hostage for some period of time?

11         A.     We were held hostage for approximately seven hours.

12         Q.     Was your daughter sexually assaulted?

13         A     My daughter, who was 16 at the time, was repeatedly assaulted
     sexually --

14
            MR. BROWN:     Your Honor, I apologize.

15          THE WITNESS:     -- my son was kidnapped.

16   BY MR. BELL:

17         Q.     Tommy?

18         A.     Yes.

19          THE COURT:     If you have something of relevance to show in terms of the

20   purpose of it, would you get to that point, please.

21   BY MR. BELL:

22         Q.     Tommy was kidnapped?

23         A.     Yes, he was.

24         Q.     How long was he held by the kidnappers?

25         A.     Over 30 days.

26         Q.     And he was at some point released?

51

1    A.    He was released in the middle of the Utah desert.

2    Q.    Did that change Tommy, this incident?

3    A.    They tried to cut his ears off.

4    And he was -- he was -- he was very changed.  He was -- he would come in
and he'd go around and make sure doors were locked.  And it changed all of us.  And
5    it was something that we had to learn to live with, and we tried to help each other, but
Tommy was just -- he was just -- he was afraid so many, many times.

6
    Q.    Let's skip up, then, to you're in Las Vegas and you live close to the
7    Albertson's store?

8    A.    Yes.  Three blocks away.

9    Q.    And Tommy got a job there as a courtesy clerk?

10    A.    Yes.  He'd been with Albertson's for two years.

11    Q.    At the time of his death?

12    A.    Yes.

13    Q.    And his job was to?

14    A.    He was a courtesy clerk.  It was his title, but he did ever so much more
than that.  He'd do bagging, he'd work in the -- go back and clean the stockroom.
15    Any time anybody needed anything in the store, he'd help them.  He'd go over and
help in the deli.  It was -- it was about his title.  He loved it though.

16
                        *     *     *
17
    Q.    He'd help people in and out with their groceries?
18
    A.    Yeah.  There's one little lady that -- she was an invalid.  He used to go
19    out and carry her in, put her in the little cart so that she'd be able to be in the little
motorized thing and go through because she couldn't walk in.
20
    Q.    How did you come to find out about Tommy's death
21
    A.    Tori's friend called very early in the morning and said that there had
22    been a robbery and shooting at Albertson's.  I was getting ready to go to work and
she came and told me.
23
    I turned the TV on.  It was all over TV.  And I just -- I ran over to Albertson's
24    right away.  And for an hour and a half I went around and I was asking everybody,
"Have you seen Thomas Darnell?" because everybody knew Tommy.  Everybody
25    kept saying, "No.  No.  I haven't seen him."  I looked and I searched for him for an
hour and a half.  And I was extremely -- I was frantic because of what happened in
26    Colorado.  I knew the state of mind that he was -- had to be in, and I had to find him.

52

1   After I was there for about an hour and a half, the policeman and a woman from Victim's Assistance came up to me and said, "There's been four fatalities and there's one person that right now is in surgery at UMC and he's very critical, and we believe that to be your son."

2

3   They took -- I called my husband on the cell phone with my daughter and she got in touch with everybody else in the family, and I went to UMC.  And at UMC I waited what seemed forever.  And then the surgeon came down and the nurses came down, and they told me about the full surgery, about all of the injuries, about bone fragments, about the bullet still being stuck in the neck that couldn't be removed.  And I'm praying at least just please, God, let him live.

4

5

6

7   A half an hour later he came out and says, "Does your son have tattoos?"  and I said, "He doesn't have one tattoo."  "I'm sorry, ma'am, that's not your son."  It was Troy.

8

9   Q.   So then what did you do?

10   A.   It was right after that, probably a half an hour that they came in and they said, "You need to go back to Albertson's."  And someone took me back to Albertson's, to the coroner's trailer.  And that's not where Tommy was supposed to end at.

11

12

13   He gave to everybody.  People in the area there, in the neighborhood.  If anybody went to him and asked him for help for anything, he didn't have a lot to give, but he'd give anybody everything he had because he gave it from the heart.  He befriended everybody.  The little kids that were having trouble with their math in school and had tutored them, the old ladies that he helped all the time.  The people that work at the Wienerschnitzel, there's two elderly ladies there.  Every day he'd come home from work and he'd stop by and get these big trash cans and go empty them because he said, "They're too heavy for them."  And, "Tommy, you don't need to be there."  He said, "I know.  They need a little help."  "That's okay, Mom."

14

15

16

17

18   Q.   Just briefly, share with us the effect on you and your husband this last year.

19   A.   It was indescribable.  There's not a day that goes by that our family doesn't cry.  We get up in the morning, I come out my bedroom door.  Tommy's bedroom was directly across from mine.  I can't go in and change his room again.  I know I have to, but I can't.  It's like when I do something in there, like I'm taking him away, and I just can't do it.  Our jobs, our health, has taken a tremendous toll.  Our friends, if you want to console, but how do you console?  You pat on the back it's just – you just never stop crying.  Nothing will bring Tommy back.  We miss him.

20

21

22

23   Q.   Is there anything else you want to share?

24   A.   (No audible response.)

25   THE COURT:   Is there anything else, ma'am?

26   THE WITNESS:  No.

53

Transcript of Jury Trial, July 17, 2000, Exhibit 47, pp. 82-95; *see* Second Amended Petition, pp. 185-87.

On his direct appeal, Floyd raised a claim regarding Nall's testimony, and the Nevada Supreme Court ruled as follows:

> Floyd also contends that the prosecution committed misconduct by eliciting improper victim impact testimony.
>
> Mona Nall, the mother of murder victim Thomas Darnell, testified during the penalty phase. She related an incident in which her son was assaulted and kidnapped. When she began to tell how the kidnappers came to her own house, the district court initially sustained an objection by defense counsel. After the prosecutor said the testimony would become relevant to show who the victim was, the court said it would permit some more questioning. The witness then testified that she, her husband, their son, and their 16-year-old daughter were held hostage for seven hours and the daughter was sexually assaulted. Defense counsel again objected, and the court asked the prosecutor, "If you have something of relevance to show ..., would you get to that point, please?" The witness then said that her son was held hostage for over 30 days and was finally released in the Utah desert after his abductors tried to cut off his ears.
>
> Victim impact testimony is permitted at a capital penalty proceeding under NRS 175.552(3) and under federal due process standards, but it must be excluded if it renders the proceeding fundamentally unfair. [Footnote: *Leonard v. State*, 114 Nev. 1196, 1214, 969 P.2s 288, 300 (1998).] The United States Supreme Court has stated that victim impact evidence during a capital penalty hearing is relevant to show each victim's "uniqueness as an individual human being." [Footnote: *Payne v. Tennessee*, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).] Admissibility of testimony during the penalty phase of a capital trial is a question within the district court's discretion, and this court reviews only for abuse of discretion. [Footnote: *Rippo v. State*, 113 Nev. 1239, 1261, 946 P.2d 1017, 1031 (1997).] Here, although the jurors heard the evidence, it is apparent that the district court actually considered it irrelevant.
>
> NRS 175.552(3) provides that "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." Nevertheless, NRS 48.035(1) remains applicable in a capital penalty proceeding and provides that even relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." [Footnote: *See McKenna v. State*, 114 Nev. 1044, 1051-52, 968 P.2d 739, 744 (1998) (recognizing that admissible penalty evidence must satisfy NRS 48.035(1)).]
>
> Some evidence of the travails that victim Thomas Darnell endured in his life was certainly relevant, but evidence that his entire family was kidnapped and his sister sexually assaulted was so collateral and inflammatory that it violated NRS 48.035(1) and exceeded the scope of appropriate victim impact testimony. Though the evidence should have been excluded, it was not so unduly prejudicial that it

1    rendered the proceeding fundamentally unfair; therefore, reversal of the sentence is
     not warranted.  [Footnote:  *See McNelton v. State*, 111 Nev. 900, 906, 900 P.2d 934,
2    938 (1995) (citing *Payne*, 501 U.S. at 825, 111 S.Ct. 2597).]

3    *Floyd*, 118 Nev. at 174-75, 42 P.3d at 261-62.

4            In *Payne*, the Supreme Court reconsidered its holdings in *Booth v. Maryland*, 482 U.S. 496

5    (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), that the Eighth Amendment prohibited

6    a capital sentencing jury from considering "victim impact" evidence relating to the personal

7    characteristics of the victim and the emotional impact of the crimes on the victim's family.  *See*

8    *Payne*, 501 U.S. at 817.  The *Payne* Court pointed out that "the assessment of harm caused by the

9    defendant as a result of the crime charged has understandably been an important concern of the

10   criminal law, both in determining the elements of the offense and in determining the appropriate

11   punishment."  *Id*. at 819.  The Court commented as follows on victim impact evidence in capital

12   sentencing proceedings:

13           Payne echoes the concern voiced in Booth's case that the admission of victim
             impact evidence permits a jury to find that defendants whose victims were assets to
14           their community are more deserving of punishment than those whose victims are
             perceived to be less worthy.  *Booth*, *supra*, 482 U.S., at 506, n. 8, 107 S.Ct., at 2534
15           n. 8.  As a general matter, however, victim impact evidence is not offered to
             encourage comparative judgments of this kind -- for instance, that the killer of a
16           hardworking, devoted parent deserves the death penalty, but that the murderer of a
             reprobate does not.  It is designed to show instead each victim's "*uniqueness as an*
17           *individual human being*," whatever the jury might think the loss to the community
             resulting from his death might be.
18

19   *Id*. at 823 (emphasis added).  According to the *Payne* Court:  "Victim impact evidence is simply

20   another form or method of informing the sentencing authority about the specific harm caused by the

21   crime in question, evidence of a general type long considered by sentencing authorities."  *Id*. at 825.

22   The Court continued:

23           We are now of the view that a State may properly conclude that for the jury to
             assess meaningfully the defendant's moral culpability and blameworthiness, it should
24           have before it at the sentencing phase evidence of the specific harm caused by the
             defendant.  "[T]he State has a legitimate interest in counteracting the mitigating
25           evidence which the defendant is entitled to put in, by reminding the sentencer that
             just as the murderer should be considered as an individual, so too the victim is an
26           individual whose death represents a unique loss to society and in particular to his
             family."  *Booth*, 482 U.S., at 517, 107 S.Ct. at 2540 (WHITE, J., dissenting) (citation

omitted).  By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers*, 490 U.S., at 821, 109 S.Ct. at 2216 (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Id.*  The Court concluded:

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id.* at 827.

In *Payne*, the Court cautioned, however:  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.  *See Darden v. Wainwright*, 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144 (1986)."  *Payne*, 501 U.S. at 825.  It is upon that statement in *Payne* that Floyd bases his claim.  Floyd claims that Nall's testimony was so unduly prejudicial that it rendered his trial fundamentally unfair.

Certainly, Nall's testimony was moving.  But the question here is not how powerful the testimony was; the question is whether or not it was "*unduly* prejudicial."  *See Payne*, 501 U.S. at 825 (emphasis added).  When Floyd went to the grocery store to shoot random people, and shot Darnell in the back, he killed an extraordinary individual.  Darnell's story -- one of courage, perseverance, and survival -- reflected his "uniqueness as an individual human being."  *See Payne*, 501 U.S. at 823.  This court does not read *Payne* to mean that, because of the very moving nature of Darnell's life story, the Due Process Clause should have prevented the prosecution from informing the jury who he was.  This was not *undue* prejudice, in this court's view.

Nall's testimony was powerful for exactly the reasons the Court in *Payne* ruled victim impact testimony admissible in capital cases.  Her testimony informed the jury who Darnell was; it related his personal characteristics and his "uniqueness as an individual human being."  *See Payne*, 501 U.S.

1    at at 823.  Her testimony spoke to the emotional impact of his loss on his family.  *See id*.  Her

2    testimony showed how Darnell's loss was a "unique loss to society and in particular to his family."

3    *See id*. at 825 (quoting *Booth*, 482 U.S. at 517 (WHITE, J., dissenting) (citation omitted)).

4           The Nevada Supreme Court ruled that part of Nall's testimony -- her testimony that Darnell's

5    entire family was kidnapped and his sister sexually assaulted -- was improper under state law.

6    *Floyd*, 118 Nev. at 174-75, 42 P.3d at 261-62 (citing NRS 175.552(3), and NRS 48.035(1)).  The

7    Nevada Supreme Court ruled that, although that testimony should have been excluded, "it was not so

8    unduly prejudicial that it rendered the proceeding fundamentally unfair."  *Id*.  In this court's view,

9    the portion of Nall's testimony that was arguably improper, regarding the kidnapping of Darnell's

10   family and the sexual assault of his sister, was of minimal impact, in light of the remaining,

11   admissible portion of Nall's testimony, and in light of the overall strength of the prosecution's case

12   in the penalty phase of the trial.  *See* discussion, *infra*, pp. 59-63.  This court agrees with the Nevada

13   Supreme Court that Floyd's trial was not rendered fundamentally unfair by the testimony of Mona

14   Nall about Thomas Darnell's life and the impact his murder had on his family.

15          The Nevada Supreme Court's ruling, denying relief on this claim, was an objectively

16   reasonable application of *Payne*.  The court denies Floyd habeas corpus relief with respect to

17   Claim 7.

18          <u>Claim 13</u>

19          In Claim 13, Floyd claims that his constitutional rights were violated "by the failure to

20   submit all the elements of capital eligibility to the grand jury or to the court for a probable cause

21   determination."  Second Amended Petition, p. 230.

22          The Nevada Supreme Court ruled on this claim, as follows, on Floyd's direct appeal:

23                 Floyd argues that before the State can allege aggravating circumstances and
             seek the death penalty, a grand jury or a justice court must first find probable cause

24           for the circumstances.  He cites the Fifth Amendment to the United States
             Constitution and Article 1, Section 8, of the Nevada Constitution, which require

25           indictment by a grand jury or the filing of an information before a person can be tried
             for a capital or other "infamous" crime.  [Footnote:  *See* U.S. Const. amend. V; Nev.

26           Const. art. 1, § 8, cl. 1; *see also Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct.
             111, 28 L.Ed. 232 (1884) (holding it constitutional for states to proceed in criminal

57

1   actions by information following preliminary examination and finding of probable
2   cause, rather than by grand jury indictment).]  Floyd's argument has no merit.

3       The United States Supreme Court has stated: "Aggravating circumstances are
    not separate penalties or offenses, but are 'standards to guide the making of [the]
    choice' between the alternative verdicts of death and life imprisonment." [Footnote:
4   *Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)
    (quoting *Bullington v. Missouri*, 451 U.S. 430, 438, 101 S.Ct. 1852, 68 L.Ed.2d 270
5   (1981)).]  Therefore, an aggravating circumstance alleged in a capital proceeding
    does not constitute a separate crime that requires a finding of probable cause under
6   the U.S. or Nevada constitutions.

7       Floyd also relies on the Supreme Court's holding in *Jones v. United States*
    that "under the Due Process Clause of the Fifth Amendment and the notice and jury
8   trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that
    increases the maximum penalty for a crime must be charged in an indictment,
9   submitted to a jury, and proven beyond a reasonable doubt." [Footnote: 526 U.S.
    227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *see also Apprendi v. New
10  Jersey*, 530 U.S. 466, 478, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).]  *Jones* does
    not support Floyd's proposition either.  The Court emphasized that its holding in
11  *Jones* did not apply to aggravating circumstances because "the finding of aggravating
    facts falling within the traditional scope of capital sentencing [is] a choice between a
12  greater and lesser penalty, not ... a process of raising the ceiling of the sentencing
    range available." [Footnote:  *Jones*, 526 U.S. at 251, 119 S.Ct. 1215; *see also
13  Apprendi*, 530 U.S. at 496, 120 S.Ct. 2348 ("[T]his Court has previously considered
    and rejected the argument that the principles guiding our decision today render
14  invalid state capital sentencing schemes requiring judges, after a jury verdict holding
    a defendant guilty of a capital crime, to find specific aggravating factors before
15  imposing a sentence of death.").

16      We conclude that a probable cause finding is not necessary for the State to
    allege aggravating circumstances and seek a death sentence.
17

18  *Floyd*, 118 Nev. at 166, 42 P.2d at 256.

19      The Nevada Supreme Court's ruling on this claim was not contrary to, or an unreasonable

20  application of, any clearly established federal law, as determined by the Supreme Court of the

21  United States.  There is no clearly established Supreme Court precedent requiring, as a matter of any

22  federal constitutional requirement, that the aggravating factors in a state capital prosecution must be

23  submitted to a grand jury or the court for a probable cause determination before trial.  The Supreme

24  Court has stated that indictment by a grand jury is not part of the due process of law guaranteed to

25  state criminal defendants by the Fourteenth Amendment.  *See Branzburg v. Hayes*, 408 U.S. 665,

26  687-88 n.25 (1972); *see also Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3 ("[The Fourteenth

                                           58

1    Amendment] has not ... been construed to include the Fifth Amendment right to "presentment or

2    indictment of a Grand Jury"....); *Gautt v. Lewis,* 489 F.3d 993, 1003 n.10 (2007) (same).  Moreover,

3    Floyd cites no clearly established Supreme Court precedent establishing a requirement from any

4    other federal-law source, beyond the Fifth and Fourteenth Amendments, that aggravating factors in a

5    state capital prosecution must be submitted to a grand jury or the court for a probable cause

6    determination before trial.

7         The court denies Floyd habeas corpus relief with respect to Claim 13.

8         Claims 1J and 16

9         In Claim 1(J), Floyd claims:

10             Mr.  Floyd's trial attorneys' performance fell below the professional standard
               expected of an attorney representing a capital defendant.  No qualified trial attorney
11             would fail to take all of the steps referenced above before presenting the claim to the
               jury considering the death penalty.
12
               Had Mr. Floyd's trial, direct-appeal, and state post-conviction attorneys
13             complied with their state and federal constitutional obligation to render effective
               assistance of counsel, Mr.  Floyd would not have been convicted of first-degree
14             murder and would not have received a sentence of death.  Mr. Floyd was deprived his
               state and federal constitutional right to effective assistance of counsel, a fair trial and
15             reliable sentencing proceeding, due process of law and equal protection.  Mr. Floyd is
               entitled to relief in the form of a new trial and a new sentencing proceeding.
16
17   Second Amended Petition, p. 82.  And, in Claim 16, Floyd claims that his conviction and death

18   sentence are unconstitutional "due to the cumulative errors in the admission of evidence and

19   instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of

20   Mr.  Floyd's right to the effective assistance of counsel." *Id*. at 238.  The court reads Claims 1J and

21   16 to assert that, when all the errors in Floyd's trial are considered together, there was constitutional

22   error warranting habeas corpus relief.

23        The court has, in the discussion above, identified the following errors, or arguable errors, and

24   has considered the effect of these on Floyd's trial, regarding whether or not they rendered his trial

25   fundamentally unfair, in violation of his federal constitutional right to due process of law:

26

59

1   -   improper closing arguments made by the prosecutors (Claim 10);

2   -   the testimony of a prosecution expert witness based in part on test
        results obtained by a defense expert, who was identified by the defense
3       as a testifying expert, but who, after the defense changed its mind, was
        not called to testify (Claim 4B(1)); and

4   -   Mona Nall's testimony regarding the kidnapping of Thomas Darnell's
5       family and the sexual assault of his sister (Claim 7).

6   The court considers these errors, or arguable errors, cumulatively, and determines that, taken

7   together, they did not render Floyd's trial fundamentally unfair.

8        The evidence against Floyd in the guilt phase of his trial was overwhelming.  There was no

9   legitimate factual dispute with regard to whether or not Floyd committed the acts that formed the

10  basis for the charges against him.  It was proven, beyond any reasonable dispute, that Floyd

11  kidnapped and sexually assaulted the woman from the outcall service.  *See* Testimony of Tracie

12  Rose Carter, Respondents' Exhibit 40, pp. 18-134; Testimony of Rena Rubalcaba, Exhibit 38,

13  pp. 160-80; Testimony of Linda Ebbert, Respondents' Exhibit 40, pp. 134-45; Testimony of Maria

14  Thomas, Respondents' Exhibit 40, pp. 145-51.  It was undisputed that Floyd entered the Albertson's

15  supermarket with a modified shotgun and shot and killed four people, and shot and attempted to kill

16  a fifth.  *See, e.g.*, Exhibit 38, p. 153 (defense counsel stating in opening statement: "our client,

17  Mr. Floyd, does not contest the fact that he went into Albertson's on June 3rd, 1999, and shot five

18  people, killing four and wounding the fifth."); *see also id*. at 153-54 (defense counsel stating in

19  opening statement: "As you know, this case really is a penalty case.  It's about determining what's

20  the appropriate punishment for Mr. Floyd.  But our system of justice and the mechanisms involved

21  with that require us to go through this portion of the trial in order to get to the penalty portion of the

22  trial.  That's just the way it is.  At penalty phase there will be other witnesses presented, there will

23  be other evidence presented to you that you will be able to consider in the penalty."); *see also*

24  Exhibit 43, p. 36 (defense counsel stating in closing argument:  "He went into that store and he shot

25  five people and there's not a contest from us about that.").

26

In the guilt phase of the trial, the defense attempted to raise a factual issue with respect to Floyd's state of mind -- that is, whether the State proved, beyond a reasonable doubt, that Floyd had the *mens rea* required for first degree murder.  But there, too, the evidence against Floyd was overwhelming.  The evidence showed plainly that Floyd had the mental capacity to plan the shooting spree and carry it out, and that he did so with malice aforethought and premeditation, and intentionally, willfully, and deliberately.  During the course of the kidnapping and sexual assault, Floyd told the sexual assault victim, in some detail, of his plan to shoot and kill random people -- that he had nineteen shotgun shells, and he intended to use those shells to kill the first people he saw, and then himself.  *See* Testimony of Tracie Rose Carter, Respondents' Exhibit 40, pp. 18-134. The evidence showed that Floyd took careful, deliberate steps to execute his plan.  *See*, *e.g.*, Testimony of Tracie Rose Carter, Respondents' Exhibit 40, pp. 76-79 (before he walked to the supermarket, Floyd put on a robe, hid his shotgun under the robe, had the sexual assault victim help him tie the robe, and asked her if she could see the shotgun).  The defense's contention that Floyd was too intoxicated to form the *mens rea* necessary for first degree murder was belied by the evidence regarding the deliberate steps that Floyd took to carry out the shooting, and also by evidence showing that, when Floyd shot and killed four people and shot and seriously wounded a fifth, his blood alcohol level was no more than approximately 0.14%, a level at which a heavy alcohol drinker like Floyd could function intentionally, willfully, and deliberately.  *See* Testimony of Minoru Aoki, Respondents' Exhibit 41, pp. 134-52.  In short, in the face of the overwhelming evidence presented by the prosecution, the defense was able to raise no question regarding Floyd's guilt.

The penalty-phase case against Floyd supporting the death penalty was also extremely strong.  In its opinion on Floyd's direct appeal, the Nevada Supreme Court aptly summarized the penalty-phase evidence as follows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The same three aggravating circumstances were found for each murder:  it was committed by a person who knowingly created a great risk of death to more than one person by means which would normally be hazardous to the lives of more than one person; it was committed at random and without apparent motive; and Floyd had, in the immediate proceeding, been convicted of more than one murder.  The evidence supports the finding of each of these circumstances.  The first is established by the fact that Floyd repeatedly fired a shotgun while walking and running through a supermarket where a number of people were present.  The second is amply supported by a record that shows that Floyd knew nothing about the people he killed or why he had killed them.  For example, immediately after his arrest, Floyd said, "Why did I kill those people?  I, I don't know."  Finally, Floyd was convicted of four murders in this case, establishing the third circumstance.

*　　*　　*

Floyd presented a number of witnesses to testify in mitigation.  A family friend and a coworker both testified that they knew him to be a good person and that the person who committed the crimes in this case was not the Zane Floyd they knew.  The coworker and Floyd's stepfather testified respectively that when they met Zane in jail immediately after the crimes he was "like a zombie" and "wasn't there."  His stepfather also told of Floyd's difficulties and behavioral problems in school and of how well he later did in the Marine Corps.  A former Marine who served with Floyd as an instructor in combat training school testified that Floyd was the best instructor, that "in the field, he would be a perfect Marine," but that "on his own" he did not do well.

Floyd's close friend testified that he and Floyd began using marijuana and methamphetamine when they were fifteen or sixteen.  The friend testified that Floyd's mother was often intoxicated and that on Floyd's sixteenth birthday his stepfather played drinking games with Floyd and his friends.  After Floyd returned from the Marines, his friend reintroduced him to methamphetamine, which they sometimes used without sleeping for several days.

Floyd's mother testified about her own drug and alcohol abuse and the loss of her first child, which caused her to drink even more.  When she became pregnant with Floyd, her husband was displeased, they separated, and he filed for divorce just before Floyd's birth.  She described Floyd's learning and behavioral problems as a child.  She also spoke about how he played baseball and loved animals.

A clinical social worker and psychoanalyst conducted a psychosocial evaluation of Floyd and testified to the following.  Floyd's mother had used various illegal controlled substances and abused alcohol.  Floyd's stepfather also abused alcohol and was sometimes violent towards Floyd's mother.  Floyd had difficulties in school and began drinking when he was fifteen and using methamphetamine when he was sixteen.  He enlisted in the Marine Corps at age seventeen.  After four years he was honorably discharged on condition that he not reenlist because of his alcohol problems.  When he was twenty-two, Floyd attempted to contact his biological father, who refused any contact.  Returning home from the military, Floyd lived with his parents.  He had no driver's license because of a DUI.  He worked for a short time at Costco, but was terminated.  He then obtained employment as a security guard, but lost that job in May 1999.  That same month his cousin was killed, which affected him and other family members deeply.

62

1          Psychologist Dr. Dougherty testified and gave his opinion that Floyd

2      suffers from the mental disease of mixed personality disorder with
       borderline, paranoid, and depressive features.  In addition, I confirmed
3      the prior diagnosis of attention deficit hyperactivity disorder ... It's my
       opinion ... that Mr. Floyd's reasoning was impaired as to rational
4      thought at times, and at times he did not act knowingly and purposely
       at the time of the alleged incident.  His symptoms were exacerbated by
5      a long history of the ingestion of drugs and alcohol.

6          Floyd spoke in allocution and took responsibility for what he had done and
       said he could not tell why he did it.  He said he was sorry and would regret his
7      actions for the rest of his life.

8   *Floyd*, 118 Nev. at 175-77, 42 P.3d at 262-63.  The aggravating circumstances were established

9   beyond any real dispute, and they were extremely weighty -- the killing of four people and the

10  endangerment of many more, randomly and without any apparent motive -- and the mitigating

11  evidence did not come close to outweighing those aggravating circumstances.

12      In light of the strength of both the guilt-phase and penalty-phase cases against Floyd, the

13  effect of the errors, and arguable errors, identified by this court, considered cumulatively, was

14  de minimis.  Floyd's trial was not fundamentally unfair.  There was no due process violation.

15      The court, therefore, denies Floyd's second amended petition for writ of habeas corpus.

16  Certificate of Appealability

17      This is a final order adverse to Floyd.  Therefore, Rule 11(a) of the Rules Governing Section

18  2254 Cases in the United States District Courts mandates that this court must issue or deny a

19  certificate of appealability.  *See* 28 U.S.C. § 2253(c); Rule 11(a), Rules Governing Section 2254

20  Cases in the United States District Courts; Fed. R. App. P. 22(b).

21      The standard for the issuance of a certificate of appealability requires a "substantial showing

22  of the denial of a constitutional right."  28 U.S.C. §2253(c).  The Supreme Court interpreted

23  28 U.S.C. §2253(c) as follows:

24          Where a district court has rejected the constitutional claims on the merits, the
        showing required to satisfy § 2253(c) is straightforward:  The petitioner must
25      demonstrate that reasonable jurists would find the district court's assessment of the
        constitutional claims debatable or wrong.  The issue becomes somewhat more
26      complicated where, as here, the district court dismisses the petition based on
        procedural grounds.  We hold as follows:  When the district court denies a habeas

1  petition on procedural grounds without reaching the prisoner's underlying
2  constitutional claim, a COA should issue when the prisoner shows, at least, that
   jurists of reason would find it debatable whether the petition states a valid claim of
   the denial of a constitutional right and that jurists of reason would find it debatable
3  whether the district court was correct in its procedural ruling.

4  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

5  (9th Cir.2000).

6      The court finds that, applying these standards, a certificate of appealability is warranted with

7  respect to the following issues:

8      -   the claim in Floyd's second amended petition for writ of habeas corpus, in
           Claim 10A, that the prosecutors made improper closing arguments, and the
9          related claims in Claims 1D(1), 1J, 10B, 16, and 17A, and the request for an
           evidentiary hearing with respect to those claims;
10

11      -   the claim in Floyd's second amended petition for writ of habeas corpus
           regarding the testimony of a prosecution expert witness based in part on test
12         results obtained by a defense expert, who was identified by the defense as a
           testifying expert, but who, after the defense changed its mind, was not called
13         to testify (Claim 4B(1));

14      -   the claim in Floyd's second amended petition for writ of habeas corpus
           regarding Mona Nall's victim impact testimony, regarding the kidnapping of
15         Thomas Darnell's family and the sexual assault of his sister (part of Claim 7);

16      -   the court's determination, in ruling on the respondents' motion to dismiss, that
           the statute of limitations at Nev. Rev. Stat. 34.726 was adequate to support
17         application of the procedural default doctrine; and

18      -   the issue whether Floyd can establish cause and prejudice, under *Martinez v.
           Ryan*, 134 S.Ct. 296 (2013), to overcome his procedural default of the
19         following claims:  Claims 1A, 1B, 1D (in part), and 17 (in part); Claims 1C,
           1F, 1G, and 2, as incorporated by reference into Claim 1; and Claim 5, when
20         considered as a new claim under *Dickens v. Ryan*, 740 F.3d 1302, 1319-20
           (9th Cir.2014) (en banc) *cert. denied Dickens v. Arizona* 522 U.S. 920 (1997).

21      The court declines to issue a certificate of appealability with respect to any other issue.

22  ///

23  ///

24  ///

25  ///

26  ///

1    **IT IS THEREFORE ORDERED** that petitioner's motion for evidentiary hearing

2    (ECF No. 135) is **DENIED**.

3    **IT IS FURTHER ORDERED** that petitioner's second amended petition for writ of habeas

4    corpus (ECF Nos. 66 and 95) is **DENIED**.

5    **IT IS FURTHER ORDERED** that petitioner is granted a certificate of appealability with

6    respect to the following issues:

7    -    the claim in Floyd's second amended petition for writ of habeas corpus, in
          Claim 10A, that the prosecutors made improper closing arguments, and the

8         related claims in Claims 1D(1), 1J, 10B, 16, and 17A, and the request for an
          evidentiary hearing with respect to those claims;

9

10   -    the claim in Floyd's second amended petition for writ of habeas corpus
          regarding the testimony of a prosecution expert witness based in part on test
          results obtained by a defense expert, who was identified by the defense as a

11        testifying expert, but who, after the defense changed its mind, was not called
          to testify (Claim 4B(1));

12

13   -    the claim in Floyd's second amended petition for writ of habeas corpus
          regarding Mona Nall's victim impact testimony, regarding the kidnapping of
          Thomas Darnell's family and the sexual assault of his sister (part of Claim 7);

14

15   -    the court's determination, in ruling on the respondents' motion to dismiss, that
          the statute of limitations at Nev. Rev. Stat. 34.726 was adequate to support

16        application of the procedural default doctrine; and

17   -    the issue whether Floyd can establish cause and prejudice, under *Martinez v.
          Ryan*, 134 S.Ct. 296 (2013), to overcome his procedural default of the
          following claims:  Claims 1A, 1B, 1D (in part), and 17 (in part); Claims 1C,

18        1F, 1G, and 2, as incorporated by reference into Claim 1; and Claim 5, when
          considered as a new claim under *Dickens v. Ryan*, 740 F.3d 1302, 1319-20

19        (9th Cir.2014) (en banc) *cert. denied Dickens v. Arizona* 522 U.S. 920 (1997).

20   With respect to all other issues, petitioner is denied a certificate of appealability.

21   **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter an Amended Judgment

22   accordingly.

23   Dated this 17th day of December, 2014.

24

25   _____

26   UNITED STATES DISTRICT JUDGE